[S. F. No. 13041. In Bank.—April 27, 1931.]

CENTRAL PACIFIC RAILWAY COMPANY (a Corporation) et al., Appellants, v. COUNTY OF ALAMEDA (a Body Politic and Corporate) et al., Respondents.

Frank Thunen for Appellants.

Earl Warren, District Attorney, Ralph E. Hoyt, Chief Assistant District Attorney, Paul St. Sure, Assistant District Attorney, and James H. Oakley, Deputy District Attorney, for Respondents.

THE COURT.—This case was appealed to this court and thereafter transferred to the District Court of Appeal in and for the First District. It was then assigned to Division One of said District Court of Appeal, and later transferred to this court for the reason that the concurrence of two justices of said District Court of Appeal in a judgment therein could not be obtained. Upon its submission to us we have carefully examined the briefs of counsel filed in the case and the opinions of the several members of the District Court of Appeal prepared by them when the appeal was before that court. After this examination we have arrived at the conclusion that the opinion of Mr. Justice Knight of said District Court of Appeal correctly expresses the views of this court upon the questions presented on this appeal, and we have therefore adopted said opinion, with slight modifications, as the opinion of this court. The opinion as thus approved and adopted by this court is as follows:

"The essential facts appearing in the record are as follows: For approximately seventy years the county of Alameda has maintained a public highway through and along the bottom of the Niles canyon from Niles to Sunol. It was laid out and declared to be such by the county in 1859, and has since served as one of the main arteries of travel between the bay regions of southern Alameda county and the Livermore valley. The canyon from Stony Brook, about two miles east of Niles, easterly to Sunol is narrow, deep, rugged, about three miles long, and through it runs the Alameda creek; and owing to its steep cliffs it is impracticable to maintain a highway through it except along the bottom thereof. In 1862 Congress enacted the so-called Pacific Land Grant Act [12 Stat. 489], whereby the Central Pacific Railroad Company was granted a right of way

400 feet wide over and across government lands in California to the Pacific coast, for the purpose of constructing along the center thereof a railroad and telegraph line to serve as a link in the first transcontinental railroad. Part of the route selected by said company was through the Niles canyon, which was then unappropriated public land; but on account of the narrowness of the canyon the right of way selected necessarily embraced within its boundaries part of the land occupied by the Alameda county highway. In 1868 said company finished building a single-track railroad through the canyon, over which it has since operated its trains; but the construction and operation of the railroad has never interfered with the free use of said highway.

"In 1910 or thereabouts, on account of the flood waters of the creek, the county was obliged to reconstruct much of its highway, and in doing so it moved a considerable stretch, lying about midway between Stony Brook and Sunol, within the railroad right of way and on the north side of the creek, to the south side of the creek and outside of the right of way; and in 1911 the discontinued portions were formally abandoned by the county, so that at the time this action was instituted the highway lay within the boundaries of the railroad right of way for a distance of about a half mile at the westerly end of the canyon and for the distance of about a mile and a half at the easterly end of the canyon. It also overlaps the right of way slightly at a point between the two stretches above mentioned and near the westerly end of the canyon; and it appears from appellants' map (plaintiffs' exhibit No. 6) that the highway crosses the railroad track twice, once at the extreme westerly end of the canyon, near Stony Brook, and again about a half mile west of the easterly end of the canyon. Since 1911 the county has expended more than $100,000 for the upkeep and improvement of said highway.

"In 1925 the appellant railroad companies brought this action to obtain a decree establishing in them title in fee simple to and right to the exclusive possession of those portions of the right of way now occupied by the public highway, and to oust the county therefrom, claiming that such title and right of possession was acquired by the Central Pacific Railroad Company under the Pacific Land Grant Act of 1862. The answer of the county urged, among

other defenses, that by virtue of the facts above stated it had acquired an easement by reason of necessity over those portions of said right of way now occupied by its highway, and it asked for a decree accordingly.

"The trial court sustained the county's claim to such easement, finding in this regard that said highway was a public necessity and that 'the topographical, geographical and other physical features and conditions existing in the disputed portions of the right of way through Niles canyon, viz.: the narrowness of. the canyon, proximity of Alameda creek, which in the winter season becomes a torrential stream, sometimes capable of destroying bridges and roadways, and the steep sides of the canyon, make it practically necessary to maintain the highway through the disputed territory because of the overwhelming difficulties to substitute a different route in those places where the road is within the 200 foot limit from the center line of the main track of the railroad. . . . ' It also found that except for those portions formally abandoned, the county in rebuilding the highway in 1910 or thereabouts followed substantially the line of the then existing road; but that it could not be ascertained from the evidence how much of the then existing road followed the line of the road constructed under the proceedings of 1859.

"After leaving the canyon the highway continues on easterly into San Joaquin county, following generally along and portions of it lying within the railroad right of way, title to which, and to a by-road intersecting the main highway near Stony Brook, appellants sought by this action to quiet, and were granted an unqualified decree accordingly. But we are not concerned with that part of the decree on this appeal, because the county admits that beyond the walls of the canyon the topographical and other physical conditions are such as to make it unnecessary for the highway to occupy any portion of the railroad right of way.

"The trial court's conclusions of law were that the Central Pacific Railway Company is the owner of the paramount title in fee to the land now occupied by said highway and lying within the boundaries of said 400-foot right of way, 'subject to an easement in favor of defendant County of Alameda by reason of necessity to maintain its present right of way for highway purposes . . . subject, however,

to the terms and conditions of that part of section 2 of the Act of Congress approved March 3, 1875, entitled "An act granting to railroads the right of way through the public lands of the United States" (18 Stats. 482 [43 U. S. C. A., sec. 935]), declaring "and the location of such right of way through any canyon, pass or defile shall not cause the disuse of any wagon or other public highway located therein, nor prevent the location through the same of any such wagon road or highway where such road or highway may be necessary for the public accommodation; and where any change in the location of such wagon road is necessary to permit the passage of such railroad through any canyon, pass or defile, said railroad company shall, before entering upon the ground occupied by such wagon road, cause the same to be reconstructed at its own expense in the most favorable location and in as perfect a manner as the original road." '

"Judgment was entered in conformity with the foregoing conclusions of law, and in applying the provisions of the Act of 1875 it was decreed that 'pursuant to the terms of said act of Congress, and under the paramount title of plaintiff Central Pacific Railway Company, plaintiffs may enter upon the whole or any part of all or any of said (three) parcels of land (lying within said right of way and designated in the findings as parcels D, E and F) and exclude the defendants and all thereof, and all persons claiming to or to claim under the defendants or any thereof, from the possession of the whole or any part of all or any of said parcels hereinabove designated as parcel D, parcel E and parcel F; provided, however, that plaintiffs shall first reconstruct, at their own expense or at the sole expense of either thereof, in the most favorable location and in as perfect a manner as the original road, such portion or portions of the said original road as may be repossessed by the plaintiff to the exclusion of the defendants.'

"The record shows beyond question that all of the proceedings for the establishment of a public highway from Niles to Sunol were taken by the County and completed long before the enactment of the Pacific Land Grant Act of 1862, and consequently long prior to the time the railroad acquired any rights whatever in the canyon. In this regard the trial court found 'that in the year 1859 defendant

Alameda County surveyed and laid out through the Niles canyon, under survey No. 247, a county road which was the same year declared by the board of supervisors of said county to be a public highway'; and part of the evidence supporting the finding shows that pursuant to a petition presented to the board in November, 1858, survey No. 247 was made by the board and filed in May, 1859; and that after due notice and hearing the board declared the road as surveyed and located to be a public highway and directed that it be opened forthwith. The proceedings above mentioned substantially complied with the requirements of the earlier statutes under which public highways were established (Stats. 1850, p. 200; Stats. 1855, p. 192); and there would appear to be nothing in the record to justify the belief, as appellants claim, that the highway contemplated by survey No. 247 was never constructed, unless, perhaps, it be the map prepared by appellants' engineers and introduced in evidence as part of appellants' case (plaintiffs' exhibit No. 6), which places the line of the road up along the side of the canyon, where no trace of a road could be found. But the correctness of the line delineated on said map may be seriously doubted in view of the testimony showing the impossibility of relocating the line of the road laid out by the old survey with any degree of certainty from the notes thereof, because the survey was made pursuant to methods long since discarded as inaccurate; and furthermore, the monuments to which the survey was tied have long since disappeared. In opposition to the map and as showing that a highway was constructed pursuant to the survey of 1859 the record discloses the uncontradicted testimony of two old settlers, one of whom had been a resident of Sunol since 1858, and who testified that he traveled over the completed road through the canyon in 1862 and continuously thereafter. The other had been a resident of Niles since 1863, and he testified that he traveled over the completed road through the canyon as early as 1863 and continuously thereafter; and both testified that except for changes necessitated by the flood waters of the creek, which resulted in shifting a portion of the road from the north to the south side of the creek, the line of the present road corresponds in every particular with the old road as they traveled it in

the early sixties. These changes were covered by the abandonment proceedings in 1911. And the trial court found in effect, and the evidence shows, that although the highway called for by survey No. 247 did not remain in its original location throughout its entire length, the 'parts of the old road numbered 247 not expressly abandoned by the board of supervisors on said date (March 27, 1911) and not included within the limits of the county road No. 4974 (constructed in 1911) are part of the present traveled road'.

■ "True, the original highway was built over government land prior to the passage of the congressional act of 1866, which for the first time granted rights of way 'for the construction of highways over public lands not reserved for public use'; but the government has never objected to the legal status of the highway, and as said in the case of *Town of Red Bluff* v. *Walbridge,* 15 Cal. App. 770 [116 Pac. 77, 80], in dealing with a similar situation: 'As against the federal government it (the county here) could not perhaps make a public highway over its lands without its consent or acquiesence, but the federal government is not complaining, and its policy has always been to encourage the building of highways over the public domain, thereby facilitating its settlement and use, and this policy was crystallized into a statute passed on the 26th day of July, 1866. . . . '

"Appellants contend, however, that the effect of the intervening Land Grant Act of 1862 was to extinguish any prospective rights the county may have acquired to a public highway through the canyon and to vest absolutely in the railroad exclusive ownership in fee of a right of way 400 feet wide through the canyon, no part of the area of which was thereafter subject to easement by the county; and that, therefore, notwithstanding the urgent necessity for the easement and the admitted fact that the railroad company knowingly allowed the highway to remain on those portions of its right of way now in dispute and to be traveled continuously for upwards of sixty years, and to be improved by the expenditure thereon of more than $100,000, the county acquired no rights whatever therein. I cannot agree with appellants' contention in this respect.

■ "As to the nature and extent of appellants' title, it may be stated that the Land Grant Act of 1862 was one of several passed by Congress in the early sixties, granting unto various railroads rights of way over government lands, and in all of them the language used in granting the rights of way in specifying the conditions upon which the grants were made are substantially the same. These acts have been construed at different times by the federal and state courts, and while no case identical in facts to those here presented has been cited, the legal principles employed in those cases in measuring the extent of the title granted by said acts must necessarily be applied here in determining the rights of the respective parties; and when so applied clearly demonstrate, in my opinion, that no such absolute title to or right of exclusive possession in the public domain as is here claimed was ever acquired by or intended to be granted to the railroads under said acts, for if it were, the investiture of such title would have barred the public from ever afterwards encroaching in any manner upon any portions of any of said rights of way, notwithstanding that such encroachments were of urgent public necessity and would in no manner interfere with the special purpose for which said rights of way were granted to the railroads. Obviously such is not the law, as the authorities hereinafter cited will show. The contention of exclusive ownership here made was heretofore advanced by the Union Pacific Railroad Company with reference to the title it acquired under this very Act of 1862, in the early case of *Union Pac. R. R. Co.* v. *Leavenworth etc. Ry. Co.*, 29 Fed. 728, wherein it sought to prevent the construction of a crossing over its right of way; and in ruling adversely upon such contention Judge Brewer said: 'Even if it were conceded that Congress had the power to enter the territory of a state and, for any purpose, establish a line through its center over which the state had no right of crossing—a sort of Chinese wall, dividing the state into two portions, inaccessible to each other, a concession I should never be willing to make—it is clear to my mind that no assertion of such power was ever contemplated by Congress in the Pacific railroad legislation.'

"It is conceded that whatever measure of title the government granted vested *in praesenti* as of the date of the

approval of the acts (*St. Joseph & D. C. R. Co.* v. *Baldwin,* 103 U. S. 426 [26 L. Ed. 578]; *Union Pac. R. R. Co.* v. *Laramie Stock Yards,* 231 U. S. 190 [58 L. Ed. 179, 34 Sup. Ct. Rep. 101]); also that no adverse title can be acquired by the public in said rights of way which might have a tendency to impair or destroy the full enjoyment thereof by the railroad companies (*H. A. and L. D. Holland Co.* v. *Northern Pac. Ry. Co.,* 214 Fed. 920). Furthermore, up to 1912 (at which time an act of Congress was passed, as will hereinafter appear, affecting the title granted to the Union Pacific Railway Company) it was held that under no circumstances could an individual or other private interest acquire title by adverse possession to any portion of said rights of way (*Northern Pac. Ry. Co.* v. *Townsend,* 190 U. S. 267 [47 L. Ed. 1044, 23 Sup. Ct. Rep. 671]). But manifestly by granting said rights of way the government did not divest itself of all ownership therein. As held in the Townsend case, *supra,* which involved a construction of the act of 1862: 'In effect the grant was one of limited fee, made on an implied condition of reverter in the event that the company ceased to use or retain the land for the purpose for which it was granted'; and in further limitation of the fee the courts have held that neither the whole nor any portion of the rights of way thus granted may be alienated by the railroads, nor voluntarily dedicated by them to any public use (Holland case, *supra*); and by the terms of the act of 1862 itself it is provided that ' . . . Congress may, at any time, having due regard for the rights of said (railroad) companies named herein, add to, alter, amend, or repeal this act.' █ Moreover, it has been consistently held that in cases of public necessity such rights of way are at all times amenable to the public power of the state and subject to the state's right of eminent domain, provided that in the exercise thereof the special purpose of the grant to the railroad is not thereby impaired. In this regard the Townsend case, *supra,* declares: 'Of course, nothing that has been said in anywise imports that a right of way granted through the public domain within a State is not amenable to the police power of the State. Congress must have assumed when making this grant, for instance, that in the natural order of events, as settlements were made along the line of the railroad,

crossings of the right of way would become necessary, and that other limitations in favor of the general public upon an exclusive right of occupancy by the railroad of its right of way might be justly imposed. . . . ' The Holland case, *supra,* holds to the same effect, it being there said: 'Upon the one hand, the implication is clear that Congress intended that the right of way should be held and used exclusively for railroad purposes, and upon the other, it is fair to assume, it was not desired that the use be in disregard of the rights and convenience of those who should take up their abode along its course. It must have been contemplated that highway and other crossings would, in the very nature of things, be required, and in view of the self-evident need therefor, together with what must have been a common and well-understood practice of making provision for them in railroad operation, it is reasonable to suppose that the grant was made with the implied consent that ways of necessity, both public and private, might be laid out across the right of way at such places and under such conditions as would not unreasonably impair its usefulness for the purpose for which it was created.' Again, in the case of *Union Pacific R. R. Co.* v. *Leavenworth etc. Ry. Co., supra,* it is expressly held that the rights of way granted under the act of 1862 are not placed beyond the reach of the power of the state's right of eminent domain, citing several earlier cases. And in the case of *North Coast Ry.* v. *Northern Pac. Ry. Co.,* 48 Wash. 529 [94 Pac. 112, 114], the same doctrine is definitely restated as follows: 'It has also been repeatedly held by other courts that a right of way of a railroad company, which has been acquired for that express purpose through a federal grant, is not exempt from the operation of state laws of eminent domain. (*Northern Pac. R. Co.* v. *St. Paul etc. R. Co.,* 1 McCrary, 302 [3 Fed. 702]; *Union Pac. R. Co.* v. *Burlington etc. R. Co.,* 1 McCrary, 452 [3 Fed. 106]; *Union Pac. R. Co.* v. *Leavenworth etc. R. Co.,* 29 Fed. 728; *Illinois Cent. R. Co.* v. *Chicago etc. R. Co.,* 26 Fed. 477.)' See, also, *Northern Pac. Ry. Co.* v. *Spokane,* 64 Fed. 506. In fact, as said in the Leavenworth etc. Ry. Co. case, *supra,* the question of the power of the state to exercise the right of eminent domain, under the conditions above stated, as to the right of way of a railroad granted by the

government 'can hardly be considered as an open one'. ■ Therefore, if under the state's police power, and subject to the conditions above stated, the public may acquire easements in railroad rights of way over government lands, through the exercise of the right of eminent domain, it would seem wholly illogical to hold in the present case that the same character of easements, subject to the same conditions, may not be acquired by the public by adverse user extending over a long period of years, without being compelled in the end to resort to the legal proceedings incident to the exercise of the right of eminent domain; because the right to the easement is founded on the doctrine of public necessity, and if it be entitled to the easement as a matter of right, the method of its acquisition would seem to be of little consequence so long as it conformed to the requirements of local state laws.

■ "Appellants contend, however, that the principle of the cases relied upon by the county to sustain its claim to an easement has no application here because those cases involve only crossings over the rights of way as distinguished from longitudinal or parallel encroachments such as we have here; and in this regard it is said that 'no case has been called to our attention which would in the slightest degree justify the encroachment here in question'. It would seem, however, that the case of *North Coast Ry. Co.* v. *Northern Pac. Ry. Co., supra,* is just such a case. There the latter company, like the Central Pacific here, was one of the grantees named in one of these land grant acts; and it selected a right of way and laid its track along the Yakima river, through a deep, narrow, mountain ravine in the state of Washington. The North Coast Railway Company sought to parallel said track for a limited distance through the ravine, over the unused portion of and within the boundaries of the other railroad's right of way, there being no other feasible route over which the North Coast Company could build the road; and it was contended there, as it is here, that the rule governing crossing cases had no application to longitudinal encroachments. But the court held directly to the contrary, saying: 'It is true the most, if not all, of the last-cited cases related to crossings of other railways over a right of way acquired by federal grant, whereas the tract here sought is not for mere crossing purposes

but is a longitudinal tract about three-fifths of a mile in length, to be carved out of claimant's right of way. The principle as to the power of eminent domain is, however, the same in both cases, depending upon the necessities of the occupying railway and those of the public service. This court has held that a longitudinal portion of a right of way may be condemned by another railway corporation where the occupying railway does not actually need it, and where it is needed by the other in the interest of the public service. *Seattle & Montana R. Co.* v. *Bellingham Bay & Eastern R. Co.*, 29 Wash. 491 [92 Am. St. Rep. 907, 69 Pac. 1107]. It is, therefore, held here that the petitioner may invoke the power of eminent domain to acquire a longitudinal part of claimant's right of way if the showing as to the necessities of the two companies in the interest of the public service is sufficient to warrant it.' And in construing the language hereinabove quoted from the Townsend case, the court said: 'It seems clear from the quotation last made that the Federal Supreme Court recognizes the power of the state to determine whether the whole of a right of way which has been created by Federal grant through an act of Congress is actually needed as against the requirements of public service, which arise with the increase of commerce and transportation necessity.'

"An analysis of the decision in the case of *H. A. and L. D. Holland Co.* v. *Northern Pac. Ry. Co., supra,* cited by appellants as sustaining their position, shows that it is not at variance with the foregoing views. The vital point there decided was that the grant to the railroads of a limited fee in rights of way over government lands carried with it no power to dedicate any portion of said rights of way for use as public streets or townsites; and that no individual claim of ownership in such rights of way, based upon an attempted dedication could be sustained; nor under such circumstances could the railroad company be estopped from afterwards asserting the full measure of the title granted to it by the government. It is true that in that particular case the court refused to apply the rule governing crossing cases to the longitudinal encroachment there involved; but the reason for such refusal was, as the decision clearly shows, that the element of public necessity for the encroachment, upon which the doctrine of the

crossing cases is founded, was entirely lacking; but nowhere in the decision does the court pretend to declare a general rule that all longitudinal encroachments are to be excluded from the operation of the rule governing crossing cases. On the contrary, the court in this regard said: 'We do not say that a case is inconceivable where, for a limited distance, some concession may not properly be made for this or an analogous purpose (a longitudinal encroachment); but the necessity must be great and the conditions unusual in the extreme to warrant it.' In the case at bar the findings and the evidence show beyond question an imperative necessity for the Niles Canyon highway, because besides furnishing the sole means of ingress to the property situate along the railroad within the canyon, it serves as the only feasible way of uniting two important and well-populated regions of the state, and therefore is vital to their development and progress.

"Furthermore, in the Holland case, one of the reasons suggested why the rule governing crossing cases should not be extended generally to longitudinal encroachments was that the latter imposed 'a much greater burden than a mere crossing, for it is practically exclusive of both possession and use by the railroad company, while a crossing only qualifies or temporarily interrupts such possession and use.' If the term 'greater burden' was there used in a legal sense, the correctness of the statement cannot be challenged; but if thereby the court meant that generally speaking all longitudinal encroachments create a greater physical burden on said rights of way than crossings, there is much room for difference of opinion, because it is a matter of common knowledge, in this day of heavy and continuous automobile traffic over the highways of the state, both for commercial purposes and pleasure, that highway crossings over railroads are a constant menace to life and property, and that vast sums of money are being expended daily by the railroads, the state, and the counties, jointly, to eliminate such crossings; whereas no such danger surrounds longitudinal encroachments such as we have here. Therefore it would seem to be an unreasonable rule which would hold that where the highway crosses the railroad track, with all of its attending dangers, it constitutes a lawful encroachment, but where for a limited distance it

runs parallel with the track and is not surrounded with the dangers of a crossing, it constitutes an unlawful encroachment. Furthermore, as already shown, the fundamental reason for the rule permitting crossings in any case is to prevent one part of a state from being walled off from another; and it follows necessarily that if it be essential to unite two areas of the state with a highway, it can make little difference in principle whether in so doing the connecting highway be laid across the railroad track in an open country or parallel with the track for a short distance, through a mountain pass or ravine; and certainly the latter is attended with far less dangers, both to the railroad company and the public, than a crossing.

"In further support of the theory that a public easement may not be acquired by adverse user, appellants quote from the Townsend case, *supra*, which in turn quotes from the case of *Northern Pac. R. R. Co.* v. *Smith*, 171 U. S. 260 [43 L. Ed. 157, 18 Sup. Ct. Rep. 794], to the effect that 'by granting a right of way 400 feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance,' and that such determination is not open to judicial review. But the rule there stated is restricted by the express language of both decisions to cases of individuals claiming title by adverse possession for private purposes, as distinguished from cases of the public claiming adverse title by reason of public necessity. In this regard the decision in the Townsend case, *supra*, reads: 'The whole of the granted right of way must be presumed to be necessary for the purposes of the railroad, *as against a claim by an individual of an exclusive right of possession for private purposes.*' And in the case of *Northern Pac. R. R. Co.* v. *Smith*, *supra*, the restrictive wording of the decision is: 'By granting a right of way 400 feet in width, Congress must be understood to have conclusively determined that a strip of that width was necessary for a public work of such importance, and it was not competent for a court, *at the suit of a private party*, to adjudge that only twenty-five feet thereof were occupied for railroad purposes in the face of the grant,' etc. The cases of *Southern Pac. Co.* v. *Hyatt*, 132 Cal. 240 [54 L. R. A. 522, 64

Pac. 272], and *Heilbron* v. *St. Louis S. W. Ry. Co.*, 52 Tex. Civ. App. 575 [113 S. W. 610, 979], were likewise actions brought by individuals to establish title by adverse possession, for private purposes. And the rule quoted from Jones on Easements is not pertinent here for the reason that none of the cases cited by the author of that work, in support of the rule, relates to railroad rights of way over government lands. Appellants rely upon language found in the Holland case, *supra*, to the effect that the 'entire right of way' of the railroad can neither be condemned nor dedicated for street purposes. Such, no doubt, is the established law, the reason therefore being that condemnation or dedication of the entire right of way would defeat the very purpose for which the right of way was granted to the railroad. But this element does not enter into this case, for as shown the action here is purely one to quiet title, based upon the claim of exclusive ownership, and consequently nowhere in their complaint do appellants allege or claim that the existence of said highway ever has interfered with the operation of their railroad, or their program of railroad expansion, nor that it is likely to do so in the future.

██ "Furthermore and aside from the doctrines of eminent domain and adverse user above discussed, the provisions of the act of 1875 quoted above expressly confer upon the public the right to occupy the unused portion of a railroad right of way granted by the government, through a canyon or defile, such as we have here, where such highway is necessary for public accommodation. ██ Appellants contend, however, that the provisions of that act cannot apply here unless they be given retrospective operation, which legally may not be done, the contention being based mainly upon the proposition that the grant of the right of way to the railroad under the act of 1862 vested instanter upon the approval of said act, and that therefore Congress had not the power subsequently to enact legislation affecting said grant; and the cases of *Union Pac. R. R. Co.* v. *Laramie Stock Yards, supra,* and *Union Pac. R. R. Co.* v. *Snow*, 231 U. S. 204 [58 L. Ed. 184, 34 Sup. Ct. Rep. 104], have been cited as supporting this proposition. I do not understand such to be the effect of the decision in either of those cases. On the contrary it appears therefrom that in 1912 Congress did enact legislation which had

the direct effect of depriving the Union Pacific R. R. Co. of certain unused portions of the rights of way previously granted to it under this very act of 1862, and the right of Congress so to do was not challenged. In this regard, the court in the Laramie Stock Yard case first points out that under the act of 1862 the grantee railroads had no power to alienate any portion of their rights of way, nor could individuals or other private interests acquire title to any portion thereof by adverse possession; and the court then goes on to say that in order to correct 'this defect of power in the companies and the defect of right in the possessors of the right of way' the act of 1912 was enacted, (which as stated was limited in its operation to the Union Pacific R. R. Co.) and which provided first that all conveyances and agreements 'theretofore made' by the Union Pacific R. R. Co. or its successors or assigns of or concerning land forming part of its right of way under the act of 1862, etc., were legalized, validated, and confirmed, etc.; and secondly, that in all instances in which title or ownership of any part of said right of way theretofore mentioned was 'claimed' as against said company or its successors or assigns, 'by or through adverse possession of the character and duration prescribed by the laws of the state in which the land is situated, such adverse possession shall have the same effect as though the land embraced within the lines of said right of way had been granted by the United States absolutely or in fee instead of being granted as a right of way.' But as will be seen from an examination of the opinion in that case, the question there raised and decided was not whether in 1912 Congress had power to pass laws affecting rights of way previously granted, but, first, whether the act of 1912 controlled as to conveyances and agreements made by the grantee railroad prior to the approval of said act as well as to those made subsequently; and secondly, whether the provisions of the act of 1912 conferring upon individuals the right to acquire title against the railroad by adverse possession, applied to cases where the period of the statute had run, fully or in part, prior to the time of the approval of the act, or only to those cases where the full period of the statute had run subsequent to the approval of the act. And it was held that because of the explicit language used

in the act relating to *conveyances and agreements* 'theretofore made' by the railroad, the provisions thereof validating such conveyances and agreements were to be given a retrospective operation; but that in the absence of any such qualifying language relating to the acquisition of the title by adverse possession the provisions of the statute having reference thereto were to be given a prospective operation; in other words, that the latter provisions were available only in those cases where the full requisite statutory period of adverse possession had run *subsequent* to the approval of said act, and not in cases where such period of time had run either fully or partly prior to the approval of the act. In both of the cases cited the full period of time fixed by the statute had run prior to the approval of the act, but admittedly had not run subsequent thereto (the causes having been submitted to and decided by the Supreme Court in 1913, about a year after the approval of the act). Consequently the judgments there under review which were based upon those admitted facts were reversed. ■ But in neither case was it held, as appellants contend, that the provisions of the act of 1912 were inoperative and ineffectual against rights of way previously granted under the act of 1862; and indeed such a conclusion would have been directly contrary to the very purpose and the express language of the 1912 act. It follows, therefore, that if in 1912 Congress had power to enact valid legislation controlling the right of possession to unused portions of rights of way granted by the government under the act of 1862, it was surely vested with the same power in 1875. And a comparison of the two acts will demonstrate that the act of 1875 was far less reaching in its effect against the railroads than the act of 1912, because obviously the purpose and effect of the act of 1875 was to confer upon the railroads the power to take or retake exclusive possession of the entire area of the rights of way and to oust the public therefrom, provided they complied with the conditions stated in the act; while the manifest purpose and effect of the provisions of the act of 1912 relating to adverse possession was to deprive the railroad permanently of those portions of its right of way which it had permitted individuals to occupy adversely for the limited statutory period, the theory upon which this sub-

sequent legislation was evidently based being that only a limited fee in said rights of way was granted to the railroads in the beginning and that the remainder of the fee was reserved in the government, over which it still had the right of control and disposition.

"Appellants further contend that the language employed in the enactment of the statute of 1875 shows that its provisions were not intended to apply to rights of way granted under the previous special land grant acts such as the act of 1862. While there is much force in the argument advanced in support of this contention, it would appear that there is reasonable ground for sustaining the trial court's conclusion to the contrary. ▮ But even assuming that the act of 1875 does not so apply, the county is nevertheless clearly entitled to a decree under the doctrine of adverse user, establishing its easement in those portions of the right of way now occupied by its highway, leaving for further determination the question of the superior need of those portions of the right of way, in case appellants should claim that the same were essential to the convenient operation of its railroad. As said in the Holland case, *supra*, 'Public use implies an underlying necessity, and the fundamental consideration, therefore, is that of superior need.'

"Appellants in their briefs have signified a willingness to enter into an agreement with the county to allow the highway to remain in its present location, provided the county recognizes appellants' exclusive title to the land occupied thereby and their right to exclude the county therefrom whenever they deem such land necessary for the convenient operation of their railroad. ▮ But according to the cases heretofore cited, it may be seriously questioned whether under the terms of their grant appellants have the power to enter into any such agreement; and it is also extremely doubtful whether the county, being given only a 'limited right of user' of the disputed land, would have any legal right to expend any public funds whatever for the improvement of a road over the railroad's property. In any event, the legal rights of the respective parties will be hereafter measured by the terms of the judgment to be rendered in the action, rather than by anything which may be stated in the briefs, and in this regard it must be

remembered that appellants are seeking a decree to quiet title to the disputed portions of the right of way and to oust the county therefrom. Therefore, conceding the good faith of the propositions made in appellants' brief, the determination of the legal problem here presented cannot be affected or influenced thereby.''

The judgment is affirmed.

Rehearing denied.