CENTRAL PACIFIC RAILWAY CO. ET AL. *v.* ALAMEDA COUNTY ET AL.

No. 258. Argued January 7, 1932. Decided February 15, 1932.

464

*Mr. C. F. R. Ogilby*, with whom *Messrs. Frank Thunen* and *Guy V. Shoup* were on the brief, for petitioners.

*Mr. Earl Warren*, District Attorney of Alameda County, with whom *Mr. T. P. Wittschen* was on the brief, for respondents.

Mr. Justice Sutherland delivered the opinion of the Court.

Petitioners brought this suit against respondents in a state superior court to quiet their title to certain lands lying within Alameda County, California. The bill alleges that the lands described constitute parts of the right of way granted by the acts of Congress approved July 1, 1862, and July 2, 1864 (c. 120, 12 Stat. 489; c. 216, 13 Stat. 356), to the Central Pacific Railroad Company, predecessor in interest of the Central Pacific Railway Company, and leased to the Southern Pacific Company; that the County of Alameda and the other defendants, without the permission or consent, and against the will, of petitioners, and without right or legal authority, had been and were then using the lands for highway or road purposes and thereby wrongfully excluding petitioners therefrom. To this bill respondents filed an answer and cross-complaint, denying some of the allegations of the bill, admitting others, and alleging affirmatively that the County of Alameda was the owner of the described lands, and was in possession and entitled to the possession thereof.

The trial court found that three of the described parcels, held in fee by the Central Pacific Railway Company, were subject to an easement in favor of the county to maintain an existing right of way for highway purposes. A decree, entered accordingly, was affirmed by the state supreme court. 299 Pac. 75.

An abridged statement of facts found by the trial court and set forth at length in the opinion of the state supreme court follows.

A public highway between Niles and Sunol, through and along the bottom of Niles Canyon, was laid out and declared by the county in 1859, and ever since has been maintained. During that time it has served as one of the main arteries of travel between the bay regions of

southern Alameda County and the Livermore Valley. In establishing the highway, the county acted by authority of, and in compliance with, the requirements of state statutes then in force. That portion of the canyon containing the segments of the highway here in question is narrow, deep, and rugged, and through it runs the Alameda Creek. Steep cliffs make it impracticable to maintain a highway through the canyon except along the bottom thereof. In pursuance of the act of Congress of 1862, *supra,* granting a right of way four hundred feet wide across the public lands to the Central Pacific Railroad Company, the company designated as part of its right of way the route through Niles Canyon, which right of way, on account of the narrowness of the canyon, embraced part of the land occupied by the highway. A single track railroad was completed in 1868, over which trains have since been operated, but thereby the free use of the highway never has been interfered with.

About the years 1910–1911, owing to the effect of flood waters, a part of the highway was moved from one side of the creek to the other and beyond the railroad right of way, the discontinued portions being formally abandoned. When this suit was begun, the highway was within the right of way for stretches of about one-half a mile at the westerly end of the canyon, about one mile and a half at the easterly end, and for a short distance between the two. The physical conditions of the canyon are such as to render the use of the lands over these stretches for highway purposes a practical necessity. In reconstituting the highway in 1910–1911, the line of the then existing road was substantially followed, except for the abandoned portions.

The trial court found that " the said highway did not exist throughout in its present location hereinabove particularly described prior to March 27, 1911, but that these parts of the old road No. 247 [the road of 1859] not ex-

pressly abandoned by the Board of Supervisors on said date and now included within the limits of County road No. 4974 [the road of 1910–1911], are a part of the present traveled road." The testimony of witnesses in respect of the identity of these parts of the new and the old roads is meager and leaves much to be desired in the way of certainty, as, owing to the great lapse of time, well might be expected. But that a road through the canyon was laid out and established in 1859, under and in accordance with the state law, and was thereafter used by the public, is not open to serious controversy, although the point is urged that the present road departs from the line of that first established. The original road was formed by the passage of wagons, etc., over the natural soil, and we know, as a matter of ordinary observation, that in such cases the line of travel is subject to occasional deviations owing to changes brought about by storms, temporary obstructions, and other causes. But, so far as the specific parcels of land here in dispute are concerned, we find nothing in the record to compel the conclusion that any departure from the line of the original highway was of such extent as to destroy the identity of the road as originally laid out and used. Even in the case of highways sought to be established by prescription, where the user must be confined to a definite line, slight deviations are not regarded as material. *Nelson* v. *Jenkins,* 42 Neb. 133, 137; 60 N. W. 311; *Burleigh County* v. *Rhud,* 23 N. D. 362, 364; 136 N. W. 1082; *Moon* v. *Lollar,* 203 Ala. 672; 85 So. 6; *Gentleman* v. *Soule,* 32 Ill. 271, 278; *Bannister* v. *O'Connor,* 113 Iowa 541, 543; 85 N. W. 767.

Here the question is not whether there had been such deviations from the original line of travel as to negative the claim that a road had been brought into existence by prescription, but whether there had been such substantial departures from portions of the line of the road established in 1859 as to constitute an abandonment of those

portions of that road, and the substitution, *pro tanto,* of a new one so removed in location as to cause it to depend for its legality not upon the original establishment but upon independent facts and considerations. The burden of sustaining the affirmative of this proposition plainly rests upon the party who asserts it, since proof of the establishment of a road raises a presumption of its continuance. That is to say, the respondents having shown the establishment by the county of a road through Niles Canyon in 1859, the continuing identity of that road must be presumed until overcome by proof to the contrary, the burden of which rests upon the petitioners. *Barnes* v. *Robertson,* 156 Iowa 730, 733; 137 N. W. 1018; *Beckwith* v. *Whalen,* 65 N. Y. 322, 332; *Eklon* v. *Chelsea,* 223 Mass. 213, 216; 111 N. E. 866; *Taeger* v. *Riepe,* 90 Iowa 484, 487; 57 N. W. 1125; *Oyster Bay* v. *Stehli,* 169 App. Div. (N. Y.) 257, 262; 154 N. Y. S. 849. This is in accordance with the general principle that a condition once shown to exist is presumed to continue. In the light of this presumption, and the absence of evidence clearly contravening it, we cannot say that the findings below are wholly without support. The conclusion follows that the portions of the highway now in question, prior to the grant of the railroad right of way of 1862, formed part of a legally constituted public road, which, since its establishment in 1859, has been in continuous use. In this view, the decree below must be affirmed upon principles settled by this court in respect of cognate cases.

By the Act of July 26, 1866, c. 262, 14 Stat. 251–253, Congress dealt with the acquisition of a variety of rights upon the public domain. By §§ 1–7, mineral lands, whether surveyed or unsurveyed, are opened to exploration and occupation, subject to regulations prescribed by law, and to the local customs and rules of miners in the several districts. Section 8, the one with which we are

here concerned, provides " That the right of way for the construction of highways over public lands, not reserved for public uses, is hereby granted." By § 9, it is provided that rights to the use of water for mining, agricultural, or other purposes, which have vested and accrued and are recognized and acknowledged by local customs, laws, etc., shall be maintained and protected; " and the right of way for the construction of ditches and canals for the purposes aforesaid is hereby acknowledged and confirmed."

In *Broder* v. *Water Co.*, 101 U. S. 274, this court had § 9 under consideration. It there appeared that the water company owned a canal for conducting and distributing water for mining, agricultural, and other uses. The canal was completed in 1853, and thereafter was in constant operation, and uniformly acknowledged and recognized by the local customs, laws, and decisions of the courts of California. Until the passage of the act of 1862, *supra,* the land through which the canal ran was the public property of the United States. A portion of it was included in the grant of lands made by that act to the railroad company from which Broder derived his title to a tract traversed by the canal. He brought suit against the water company to have the canal declared a nuisance and abated, and to recover damages. This court held, that, notwithstanding the fact that Broder's title antedated the Act of 1866, that title, nevertheless, was subject to the right of way for the canal. Upon that matter it was said [p. 276]:

" It is the established doctrine of this court that rights of . . . persons who had constructed canals and ditches . . . are rights which the government had, by its conduct, recognized and encouraged and was bound to protect, before the passage of the act of 1866. We are of opinion that the section of the act which we have quoted was rather a voluntary *recognition of a pre-existing right of*

*possession,* constituting a valid claim to its continued use, than the establishment of a new one."

The court then, referring to the clause in § 4 of the Act of July 2, 1864, *supra,* reserving from defeat or impairment by the general terms of the grant of 1862, " any pre-emption, homestead, swampland, *or other lawful claim,"* said that all such reservations were to be construed in the light of the general principle that Congress, in making the donations, could not be supposed to do so " at the expense of pre-existing rights, which, though imperfect, were still meritorious, and had just claims to legislative protection."

*Leavenworth, L. & G. R. Co.* v. *United States,* 92 U. S. 733, involved a grant to the State of Kansas of lands to aid in the construction of specified railroads; and the question was whether the grant included lands dedicated to, and occupied by, the Osage Indians. The grant was subject to a proviso reserving to the United States all lands theretofore reserved for the purpose of aiding in any object of internal improvement or for any other purpose whatsoever. It was held that this proviso had the effect of excluding the Indian lands from the operation of the grant. The court, at p. 746, said:

" It would be strange, indeed, if, by such an act, Congress meant to give away property which a just and wise policy had devoted to other purposes. That lands dedicated to the use of the Indians should, upon every principle of natural right, be carefully guarded by the government, and saved from a possible grant, is a proposition which will command universal assent."

And the court added:

" What ought to be done, has been done. The proviso was not necessary to do it; but it serves to fix more definitely what is granted by what is excepted."

Likewise, this court has recognized that the appropriation of mineral lands upon the public domain in accordance with the local customs of miners, prior to Congressional legislation, was assented to by the silent acquiescence of the government, and was entitled to protection. See *Atchison* v. *Peterson*, 20 Wall. 507, 512; *Sparrow* v. *Strong*, 3 Wall. 97, 104; *Jennison* v. *Kirk*, 98 U. S. 453, 458; *Northern Pacific R. Co.* v. *Sanders*, 166 U. S. 620, 634.

In *Jennison* v. *Kirk, supra,* at page 459, referring to the Act of 1866, this court quoted approvingly the statement of the author of the act, that " It merely recognized the obligation of the government to respect private rights which had grown up under its tacit consent and approval. It proposed no new system, but sanctioned, regulated, and confirmed a system already established, to which the people were attached."

As far back as 1855, the Supreme Court of California, in an opinion which received the approval of this court in *Atchison v. Peterson, supra,* said:

" In this State the larger part of the territory consists of mineral lands, nearly the whole of which are the property of the public. No right or intent of disposition of these lands has been shown either by the United States or the state governments, and with the exception of certain state regulations, very limited in their character, a system has been permitted to grow up by the voluntary action and assent of the population, whose free and unrestrained occupation of the mineral region has been tacitly assented to by the one government, and heartily encouraged by the expressed legislative policy of the other. If there are, as must be admitted, many things connected with this system, which are crude and undigested, and subject to fluctuation and dispute, there are still some

which a universal sense of necessity and propriety have so firmly fixed as that they have come to be looked upon as having the force and effect of *res judicata*. Among these the most important are the rights of miners to be protected in the possession of their selected localities, and the rights of those who, by prior appropriation, have taken the waters from their natural beds, and by costly artificial works have conducted them for miles over mountains and ravines, to supply the necessities of gold diggers, and without which the most important interests of the-mineral region would remain without development." *Irwin* v. *Phillips,* 5 Cal. 140, 146.

Finally, in *Cramer* v. *United States,* 261 U. S. 219, 229, it was held that public lands in the actual occupancy of individual Indians since before 1859, were excepted from the railroad grant of lands made by the Act of July 25, 1866, c. 242, 14 Stat. 239. This holding was based upon the well understood governmental policy of encouraging the Indian to forego his wandering habits and adopt those of civilized life; and it was said that to hold that by so doing he acquired no possessory rights to the lands occupied, to which the government would accord protection, would be contrary to the whole spirit of the traditional American policy toward these dependent wards of the nation. " The fact that such right of occupancy finds no recognition in any statute or other formal governmental action is not conclusive. The right, under the circumstances here disclosed, flows from a settled governmental policy. *Broder* v. *Water Co.,* 101 U. S. 274, 276, furnishes an analogy."

The present case is controlled by the same general principles. We cannot close our eyes to the fact that long before the Act of 1866, highways in large number had been laid out by local, state and territorial authority, upon and across the public lands. The practice of doing so had been so long continued, and the number of roads thus created was so great, that it is impossible to con-

clude otherwise than that they were established and used with the full knowledge and acquiescence of the national government. These roads, in the fullest sense of the words, were necessary aids to the development and disposition of the public lands. Compare *Flint & P. M. Ry. Co.* v. *Gordon,* 41 Mich. 420, 428–429; 2 N. W. 648; *Red Bluff* v. *Walbridge,* 15 Cal. App. 770, 778–9; 116 Pac. 77. They facilitated communication between settlements already made, and encouraged the making of new ones; increased the demand for additional lands, and enhanced their value. Governmental concurrence in and assent to the establishment of these roads are so apparent, and their maintenance so clearly in furtherance of the general policies of the United States, that the moral obligation to protect them against destruction or impairment as a result of subsequent grants follows as a rational consequence. The section of the Act of 1866 granting rights of way for the construction of highways, no less than that which grants the right of way for ditches and canals, was, so far as then existing roads are concerned, a voluntary recognition and confirmation of preëxisting rights, brought into being with the acquiescence and encouragement of the general government.

It follows that the laying out by authority of the state law of the road here in question created rights of continuing user to which the government must be deemed to have assented. Within the principle of the decisions of this court heretofore cited, they were such rights as the government in good conscience was bound to protect against impairment from subsequent grants. The reasons for so holding are too cogent to be denied. When, under that grant, the railroad company designated its right of way and built its line, it must be held to have done so with knowledge of the existence of the highway and subject to its continued maintenance and use.

*Decree affirmed.*