**CITY OF STEELVILLE, a municipal corporation, Respondent,**

v.

**Stanley M. SCOTT and Patricia A. Scott, Appellants.**

No. 13469.

Missouri Court of Appeals,
Southern District,
Division Three.

Dec. 17, 1984.

Motion for Rehearing or Transfer Denied Jan. 3, 1985.

Application to Transfer Denied Feb. 26, 1985.

John L. Woodward, Woodward, Rohrer & Mazzei, P.C., Steelville, for appellants.

J. Kent Howald, R. Brooks Kenagy, Beckham, Hale, Howald & Kenagy, Steelville, for respondent.

CROW, Presiding Judge.

Stanley M. Scott and Patricia A. Scott appeal from a judgment in favor of the City of Steelville establishing a "roadway easement" across the back of a tract of real estate owned by the Scotts. The judgment ordered the Scotts to remove a "concrete wall" and any other obstacle in the disputed area, and to refrain from hindering the general public in its use of the area as a roadway.

The circumstances whence this case arose can best be understood by reference to the diagram appended hereto, prepared from exhibits received in evidence at the trial.

The trial court found that the City and the general public had "acquired an easement which has become a public alley," 16 feet wide and approximately 182 feet in length, meandering between First Street and the east line of Block 8 in the City's business district. Block 8 occupies approximately the top half of the diagram, and is bounded on the east by a platted and established alley, on the south by Main Street, and on the west by First Street. Block 8 extends northerly across a railroad right-of-way, shown on the diagram, and is evidently bounded on the north by Frisco Street. The north boundary of Block 8 is not shown on the diagram, however, as that boundary is immaterial to this dispute.

The easement described in the judgment is the westernmost 182 feet, more or less, of a strip measuring approximately 510 feet in length, running an irregular course from First Street to Hickory Street. As explained *infra*, there was evidence that this 510–foot-long strip, in its entirety, had long been used as an alley by the general public.

For convenience, the term "putative alley" will henceforth be used to identify this approximately 510–foot-long strip. The westernmost 182 feet of the putative alley, as earlier noted, is the only portion of the putative alley purportedly affected by the judgment.

As shown on the diagram, the putative alley, between First Street and the east line of Block 8, crosses land titled in several different owners. The Scotts, however, were the only owners named as defendants in this suit.

The Scotts' property is rectangular in shape, the two long sides of the rectangle running generally north and south. The south side of the Scotts' tract fronts on Main Street; the north (rear) abuts the railroad right-of-way. The putative alley, where it crosses the Scotts' property, runs generally east and west. The east-west dimension of the Scotts' land, as best we can determine from the record, is between 41 and 42 feet. Thus, the Scotts account for the ownership of less than one-fourth of the route of the approximately 182–foot-long easement described in the judgment, and only about 8 per cent of the route of the approximately 510–foot-long putative alley.

Beginning at the east edge of First Street, the putative alley runs east across vacant land between two buildings identified, respectively, as "C & C Auto Parts" and "Old Masonic Lodge."

Morris Cooper, born October 16, 1900, testified that in 1888 his father owned the property designated C & C Auto Parts, together with the vacant land between C & C Auto Parts and the Old Masonic Lodge. The property owned by Morris Cooper's father, in the aggregate, will be referred to as the "Cooper property." Morris Cooper's father owned the Cooper property until 1944, when Morris Cooper acquired it by inheritance.

The Cooper property belonged to Morris Cooper from 1944 until 1969, when he sold it to "Mr. and Mrs. Chipman." During the time that they owned it, Morris Cooper, and his father before him, operated a retail business at that location.

Describing the area between C & C Auto Parts and the Old Masonic Lodge as "my vacant lot," Morris Cooper testified that "it was used for a passageway there ever since I can remember." He added: "The trucks used it there. They come through that way and unloaded the merchandise that the merchants bought from the St. Louis firms. They backed in there and unloaded their wares, whatever they had to unload for them."

Morris Cooper further explained: "One time I contemplated building there, but I decided I didn't want to do that. I wanted, I would disrupt my neighbors from using it to get their wares and one thing and another, and another reason, in case we had a fire or anything, a fire engine couldn't get in there very easy and I wanted to keep it open for the use of the public."

Morris Cooper testified that as far back as 1907, he and the general public had used the putative alley (his "vacant lot" being the extreme western segment thereof) to travel from First Street to Hickory Street, and vice versa.

The vacant lot was also regularly used for parking, not only by Morris Cooper's customers, but also by customers of nearby stores. According to Morris Cooper, "I had no objection to them using it." He recounted that it was customary in Steelville for people to use vacant land to travel between and behind buildings "whenever they so pleased."

As illustrated by the diagram, the land immediately east of the Cooper property and the Old Masonic Lodge is, according to the transcript, owned by Ike Lovan. The east-west dimension of the Lovan parcel, as best we can determine, is between 20 and 21 feet. Lovan operates a jewelry store in a building on the front (south) of his property, abutting Main Street. North of Lovan's building, his land is vacant. According to the evidence, the putative alley crosses Lovan's land some distance north of his store, then turns northeasterly and proceeds across land owned by Rowland Bass.

Bass' parcel, like Lovan's has an east-west dimension between 20 and 21 feet. A building sits on the south portion thereof, facing Main Street. The putative alley crosses Bass' land north of his building.

At the east edge of the Bass land, the putative alley reaches the Scott property, turning easterly and running behind a structure identified as "Scotts' Storage Building." This structure has evidently existed for decades. A newer structure, adjoining the south side of the storage building, was erected by the Scotts in 1976, occupying a gap between the storage building and a building fronting on Main Street, in which the Scott family has operated a retail business for three generations.

The diagram reveals that the putative alley runs obliquely across the Scotts' property, in such manner that the northern line of the putative alley crosses the north boundary of the Scott tract, entering the railroad right-of-way. The southern line of the putative alley crosses the east boundary of the Scott tract. Beginning at the northeast corner of the Scott tract, the railroad right-of-way extends south along the east boundary of the Scott tract a distance of 10 feet. Consequently, once the putative alley leaves the Scott tract, it lies entirely on the railroad right-of-way until reaching Hickory Street. According to our calculations, approximately 328 feet of the 510–foot-long putative alley are on the railroad right-of-way. A careful observer will note that a small part of the putative alley

lies on railroad right-of-way west of the east line of Block 8 (that line being the west edge of the platted and established alley, extended northward from the northeast corner of the Scott tract). The judgment therefore, ostensibly affects at least a small area of the railroad right-of-way.

The events that precipitated this suit began March 10, 1982, when the Scotts commenced excavation to install concrete footings for a wall to run north from the northwest corner of their storage building. Forms were set and concrete was poured a week later. A wall approximately 20 feet in length was erected, its north end situated 5 or 6 feet south of the railroad right-of-way. The wall extended well into—but not entirely across—the putative alley. According to Stanley M. Scott, his intention was to build an addition onto the north side of the storage building.

The City thereupon instituted this suit and obtained a temporary restraining order, resulting in cessation of construction. The wall remained intact at time of trial.

 The evidence already mentioned was not all of the evidence presented. However, the evidence, in the aggregate, viewed favorably to the result below, *Cusumano v. Outdoors Today, Inc.*, 608 S.W.2d 136, 139[5] (Mo.App.1980), established that the general public had used the putative alley, together with the other vacant land adjacent to the various business buildings, for parking, deliveries and passage between First and Hickory Streets for over 70 years before the Scotts erected the wall.

The judgment fixed the location of the putative alley, in precise surveyors' terms, from First Street to the east line of Block 8, and declared that the City and the general public had, for a period of more than 10 years, possessed, held, and used that segment of the putative alley which crosses the Scotts' land "continuously, openly, notoriously, adversely and exclusively". The judgment set out the legal description of the Scotts' land, and declared that the City held a 16–foot-wide roadway easement across it "for the use and maintenance of a roadway for the public, with all rights and privileges incidental thereto." The Scotts were permanently enjoined from "obstructing, impeding, and otherwise blocking or rendering said roadway inaccessable [sic] or unusable by the general public as a roadway." Additionally, as noted earlier, the Scotts were commanded to remove the wall and any other obstacle.

The judgment did not identify the owners of any of the other tracts across which the putative alley passes, nor did it set out the legal descriptions of any of those tracts. Additionally, as already observed, none of the owners of those tracts were parties to this suit. Moreover, there was no showing that the City, by any earlier judgment, had acquired an easement for any portion of the putative alley, or that any owner of any of the land over which the putative alley passes had granted the City an easement for such use.

In sum, although the judgment declares that a 16-foot-wide easement for use as an alley has been acquired by the City (evidently by prescription) along the described route between First Street and the east line of Block 8, it is obvious that as matters presently stand, the only segment of the route over which a roadway easement is formally established is the segment across the Scotts' land (the easement there being established only if the instant judgment be affirmed). In these circumstances, affirmance would result in encumbering the Scotts' land with a roadway easement, each end of which abuts property across which no corresponding easement has yet been formally acquired, either by judgment or conveyance.

While one might assume that the City, if challenged in the future, could, through litigation, establish a roadway easement by prescription against the owners of the other tracts across which the putative alley runs between First Street and the east line of Block 8, such result is by no means assured.

There was no testimony from the Chipmans, Lovan, Bass, or any official of the railroad, and nothing in the record indicates their attitudes toward formal recognition

of a roadway easement across their respective properties. Morris Cooper, however, was unwilling to concede the existence of such an easement during the time he owned the Cooper property. As noted earlier, he referred to the passageway between C & C Auto Parts and the Old Masonic Lodge as "my vacant lot," stating that he once contemplated building on it. It is evident that in his mind, Morris Cooper considered that the public used his vacant lot by his permission, and not in a manner hostile or adverse to his ownership. *See generally Szombathy v. City of Berkeley,* 280 S.W.2d 834 (Mo.1955); *Kelsey v. City of Shrewsbury,* 335 Mo. 78, 71 S.W.2d 730 (1934).

Additionally, the railroad right-of-way presents considerations distinct from those affecting the other tracts. *See generally* § 516.090, RSMo 1978; *Granite Bituminous Paving Co. v. St. Louis & M. R. R. Co.,* 331 Mo. 899, 55 S.W.2d 468, 472[4, 5] (1932); *St. Louis-San Francisco Ry. Co. v. King,* 329 Mo. 1203, 50 S.W.2d 94, 98[1] (1932).

We are thus confronted by the question whether a municipality may obtain, by judgment, an easement across private property for roadway purposes when the easement nowhere connects with any place that the public has, either prior thereto or contemporaneously therewith, acquired a formally recognized right of roadway use.

Though we find no Missouri case with comparable facts, there is a condemnation suit, *City of St. Louis v. Butler Co.,* 223 S.W.2d 831 (Mo.App.1949), that is helpful by analogy. There, a municipality sought to acquire a north-south strip of land for a public street. The proposed street, going north from the north boundary of the southernmost tract involved in the suit, ultimately reached another public street. However, going south from the north boundary of the southernmost tract, the proposed street crossed only that tract, which belonged entirely to one owner. The southern terminus of the proposed street

was a railroad right-of-way where there were no depots or loading docks available to the general public and no road, street or viaduct to carry traffic across the railroad tracks. Holding that the proposed taking would serve no public purpose, the opinion upheld a judgment dismissing the action as to the owner of the southernmost tract. Inasmuch as neither the public generally nor the owners of property north of the southernmost tract would obtain any benefit from the proposed extension of the street across said tract, no public use was shown. *Id.* at 834[2].

Such would be the case here if, in the future, it were determined that the public had acquired no easement across the tracts where the remainder of the putative alley lies.

We recognize, of course, that in the record before us there is evidence of public use of the putative alley for well over half a century. We have pointed out, however, the uncertainty whether such use has resulted in acquisition of a roadway easement, by prescription, over all of the separately owned tracts where the putative alley lies. That issue remains unadjudicated. Neither the character of the several tracts, nor the course of the putative alley across them, is uniform. Photographs reveal that the path of the putative alley is easily recognized as it passes between C & C Auto Parts and the Old Masonic Lodge, and farther east as it proceeds across the railroad right-of-way. The path is indistinct, however, across the vacant land owned by Lovan and Bass. All of that area is bare, and there is no established path susceptible to location or determination of width.[1]

We point out these factors only to illustrate the possibility that future litigation might determine that the public has not acquired a roadway easement by prescription across all, or perhaps any, of the remaining 92 per cent of the putative alley.

---

1. 39 Am.Jur.2d, *Highways, Streets, and Bridges* § 30 (1968), citing *Central Pacific Railway Co. v. County of Alameda,* 284 U.S. 463, 52 S.Ct. 225, 76 L.Ed. 402 (1932) states: "The public cannot acquire a right by prescription to pass over a tract of land generally, but only in a certain definite line of way."

If it should ultimately be adjudged that there is no public right of access to either end of the segment that crosses the Scott property, the public would obviously be unable to lawfully use the easement which the instant judgment purports to establish across the Scott property. That would result in the Scott property's being encumbered with a meaningless easement.

We do not decide, nor comment on, whether it would be proper to declare the existence of a roadway easement across land connecting the Scott segment with only one of the two streets (First or Hickory).[2] It may be that the trial court will never have to decide that question. The trial court may conclude that the public has, by prescription, acquired an easement across the entire course of the putative alley, connecting both streets, or the trial court may conclude that the public has not acquired an easement connecting the segment across the Scotts' property with either street. There is even the possibility that the trial court will not have to decide any of this, as the City might be successful in acquiring the easement it seeks by deeds from the owners of the respective properties across which the entire course of the putative alley lies.

All we decide is that because the instant judgment does not (and could not) establish the easement across any land except the Scotts', it cannot stand. Persons owning the land across which the putative alley passes from the Scotts' land to at least one street should have been made parties to this suit so that the existence of an easement susceptible to use by the public could have been declared in one judgment, if supported by the evidence. As an alternative to naming all such landowners as parties, the City could have (from such landowners, if any, as were so disposed) obtained deeds granting the City the easement it seeks, such deeds being made part of the evidence to demonstrate that the right to public use had been formally acquired as to such landowners' property.

We hold that because the City neither joined, as parties to this suit, the owners of the land over which the public must necessarily travel to make use of the easement across the Scotts' property, nor demonstrated that it had acquired, by conveyance, an easement across such land for such purpose, the City was not entitled to the easement granted by the trial court. To be a public road a road must, of physical necessity, be so situated and connected as to be accessible to the public. *Trammell v. Bradford*, 198 Ala. 513, 73 So. 894, 895[4] (1916). The easement across the Scotts' land, standing alone, fails to meet that requirement.

The judgment must therefore be reversed and the cause remanded to afford the City an opportunity to acquire, if it can, the easement it seeks, either by judgment or deed, or the two in combination.

Having reached this conclusion, we need not rule on all of the points briefed by the Scotts, as some may not arise on retrial. We note, however, that the Scotts, in one assignment of error, maintain they should have had a jury trial. The issue arose in the following way.

Under date of May 19, 1983, the docket sheet shows: "Plaintiff appeared by counsel, Mr. Howald. Defendants appeared by counsel, Mr. Rohrer. Cause set for trial *to court* August 29, 1983, #2 setting." (Emphasis added).

The Scotts registered no objection to the setting for a bench trial, and asserted no right to a jury trial until Thursday, August 25, 1983, four days before trial. On that date they filed a "Request For Jury" in the office of the circuit clerk. There was no showing that the court was advised of this until Monday, August 29, 1983, when the parties appeared for trial. The trial court noted that the cause had been set for non-jury trial for more than three months, "and to grant the request for trial to jury would, in affect [sic], grant a continuance because we don't have a jury ready." The trial court denied the request.

2. 1 W. Elliott, *Roads and Streets* § 2 (4th ed. 1926) states: "Although every public thoroughfare is a highway it is not essential that every highway should be a thoroughfare, as it is now well settled that a cul-de-sac may be a highway."

■ The Scotts' contention, as we understand it, is based on the belief that the City should have sought relief by the remedy of ejectment, an action at law. The City's petition, however, sought relief that included the quieting of title to the alleged easement in favor of the City across the Scotts' land. Specifically, the City prayed that the court declare that the Scotts are owners in fee simple of that land, and that the City holds a 16-foot-wide "roadway easement" across it. In addition, the City requested the injunctive relief referred to earlier.

The Scotts' argument that the City was confined to the remedy of ejectment is without merit. The remedies pursued by the City were the same as those of the successful municipality in *Cantrell v. City of Caruthersville*, 249 S.W.2d 425 (Mo. 1952). That does not mean, however, that the Scotts had no right to a jury on the quiet title issue. In *Huter v. Birk*, 510 S.W.2d 177 (Mo.1974), the plaintiffs, in one count, sought a declaration that they held an easement by prescription for use of a road across the defendants' land. In other counts, the plaintiffs sought injunctive relief regarding the road and other disputes.

The quiet title count was tried to a jury; the injunction counts were tried to the court. A judgment awarding the plaintiffs the easement and the injunctive relief was affirmed.

In the instant case, the issue is not so precisely defined, as the City has not asked for the declaration of the easement in a separate count from the injunctive relief. It may be, however, that the Scotts are nonetheless entitled to have a jury determine the easement issue. Counsel can study the authorities on the subject and cite them to the trial court if the Scotts desire a jury on retrial. We assume the Scotts will not again wait so late to make their position known. Their acquiescence in the non-jury setting, coupled with their failure to request a jury until it was obviously too late for the trial court to summon one, created an unnecessary problem for the trial court.

The judgment is reversed and the cause is remanded for further proceedings consistent with this opinion.

HOGAN, TITUS and MAUS, JJ., concur.

PREWITT, C.J., not participating.