WIENER, Circuit Judge:
Petitioner Richard Boeta appeals the final decision of the National Transportation Safety Board (“NTSB”), affirming the initial decision of an Administrative Law Judge (“ALJ”) which upheld the Federal Aviation Administration’s (“FAA”) sixty days suspension of Boeta’s air transport pilot certificate. For the reasons hereafter set forth, we (1) grant Boeta’s petition Tor review of the NTSB’s final decision; (2) reverse that decision with respect to Boe-ta’s waiver-of-sanction defense; (3) vacate the FAA’s sixty days suspension of his air transport pilot certificate; and (4) remand for further disposition and completion of . this matter by the NTSB and the FAA, consistent herewith.
I.
A.
The appealed ruling of the ALJ that affirmed the FAA’s order suspending Boe-ta’s air transport pilot certificate resulted from the flight of a small, twin-engine jet aircraft (“N497RC”) that Boeta occasionally piloted. At all relevant times, Redi-Car-pet Properties, LLC (“Redi-Carpet”) owned N497RC and Capital Aerospace, LLC (“Capital”) managed it. At no time did either Redi-Carpet or Capital have a certificate under 14 C.F.R. part 119, without which Redi-Carpet was restricted to operating N497RC under 14 C.F.R. part 91, noncommercially, for its or its lessee’s own use.[1] Redi-Carpet only did so through Capital, which served as its agent. Under this arrangement, Redi-Carpet, through Capital, had possession of and “operational control” — viz., the “exercise of authority over initiating, conducting or terminating a flight” — over N497RC as its owner.[2] Boeta, who was employed by Capital, was thus an agent of both Capital and Redi-Carpet.
Redi-Carpet could also transfer its possession and operational control of N497RC to another entity through a “dry lease” agreement, under which the lessor provides an aircraft to a lessee without furnishing the pilot or any other crew members.[3] During the course of a dry lease, Redi-Garpet, as lessor, would relinquish— and the other entity, as lessee, would assume — possession and operational control of N497RC. Capital would then operate N497RC as that lessee’s agent.
In 2009, Capital and Redi-Carpet agreed that Capital would obtain a certificate under part 119 so that Capital could operate N497RC commercially, for the benefit of other entities apart from Redi-Carpet or its lessees, under part 135. Once Capital obtained that certificate, Redi-Carpet *639 planned to transfer possession and operational control of N497RC to Capital through a dry lease agreement,[4] and Capital would then act as N497RC’s “operator” in its own right, not merely as Redi-Car-pet’s agent.
To obtain its certificate under part 119; Capital entered into an agreement with USAC Airways (“USAC”). USAC was to consult with Capital during the term of that agreement. To facilitate this arrangement, Redi-Carpet transferred possession of and operational control over N497RC to USAC under a separate dry lease agreement. This dry lease agreement stated that “[USAC] shall have full and exclusive operational control, as well as possession, command and control • of [N497RC]” and “shall have full and final authority over the dispatch and conduct of flights in [N497RC], except for safety or flight issues, over which such issues the Pilot-in-Command shall have full and final authority.”
To operate a flight commercially under part 135, the operator must not only have a certificate under part 119, but must have operations specifications (“OpSpecs”) as well.[5] OpSpecs are issued by the FAA and “prescribe [the operator’s] authorizations, limitations, and procedures,”[6] including the “[t]ype of aircraft, registration markings, and serial numbers of each aircraft authorized for use.”[7]
After entering the dry lease with Redi-Carpet, USAC requested that the FAA amend USAC’s existing OpSpecs to include N497RC, after which USAC would be authorized to operate N497RC commercially under part 135. Although Boeta remained Capital’s employee throughout, he also became USAC’s agent during this transition and was allowed to operate N497RC as its agent.[8]
USAC also obtained FAA authorization to operate N497RC in reduced vertical separation (“RVSM”) airspace, in which air traffic control (“ATC”) reduces the minimum vertical separation between aircraft from 2,000 to 1,000 feet.[9] To obtain such authorization, the operator must implement specified maintenance and training procedures which ensure that its aircraft and its pilots will operate safely in RVSM airspace.[10] It also must demonstrate that its aircraft meets specified standards. Since USAC already held a certificate under part 119, its authority to operate N497RC in RVSM airspace was included in its OpSpecs. (If it had not had such a certificate in its Op Specs, that authority could have been included in a letter of *640 authorization (“LOA”)).[11]
USAC, which had operational control of N497RC during its dry lease from Redi-Carpet, dispatched all flights on N497RC through a computer-generated flight dispatch sheet. At the ALJ’s hearing, USAC’s chief pilot stated that Boeta and all other phots at USAC “had gone through our training program so they understood about operational control and all the aspects of setting up a flight, conducting a flight, terminating a flight, and who has operational control. They understood the importance of a dispatch sheet.”
By 2011, USAC had apparently become concerned that it was “losing operation control” of N497RC. As a result, USAC gave oral notice to Capital that it was terminating their agreement. (It does not appear, however, that USAC gave notice to Redi-Carpet that it was terminating their separate dry lease agreement, although that seems to have been USAC’s intention.) USAC dispatched its last flight for Capital in March 2011. In May, USAC requested that the FAA amend its Op-Specs to remove N497RC. In so doing, USAC surrendered its authorization to operate N497RC in RVSM airspace.
Capital, which had no part 119 certifí-cate, was not authorized to operate commercially under part 135. Instead, it operated N497RC as it had prior to its agreement with USAC — viz., as Redi-Carpet’s or its lessee’s agent.
Even though the agreement between Capital and USAC had terminated (and the dry lease between Redi-Carpet and USAC had presumably terminated as well), the agency relationship between Boeta and USAC continued. No one at USAC ever spoke with or wrote to Boeta about that. Neither did USAC notify Boeta that operational control of N497RC had shifted away from USAC or that USAC was no longer authorized by the FAA to operate N497RC because USAC’s OpSpecs had been amended. However, Boeta ceased receiving USAC’s dispatch sheets and instead began receiving Capital’s trip sheets. This could have — and probably should have — indicated to him that USAC no longer had possession of or operational control over N497RC.
In September 2011 — four months after USAC had the FAA remove N497RC from its OpSpecs — Boeta received a trip sheet from Capital, instructing him to pilot N497RC from Sugar Land, Texas, to Palm Beach, Florida. Redi-Carpet apparently operated that flight noncommercially, through Capital, for its own use under part 91. Boeta, as Capital’s employee and agent, was presumably to pilot it as Redi-Car-pet’s agent.
Before commencing the flight to Palm Beach, Boeta filed a flight plan with the FAA. On it, he indicated that N497RC’s operator was authorized to use N497RC in RVSM airspace, and he proceeded to pilot the subject flight in RVSM airspace.
We can only speculate that, for reasons of its own, USAC might have alerted the FAA to N497RC’s unauthorized flight in RVSM airspace: It cannot be purely coincidental that, when Boeta landed N497RC at Palm Beach, the aircraft was met by FAA inspectors who performed a “ramp check.” They asked Boeta to verify that the operator had authorization for N497RC to be flown in RVSM airspace. Boeta initially told the inspectors that the flight had been operated under part 91, prompting the inspectors to ask to see the owner’s LOA authorizing it to operate in RVSM airspace. Boeta returned to the aircraft and “searched for sometime” before calling Capital to fax him a copy of the *641 LOA. Instead, Capital faxed a copy of USAC’s unamended OpSpecs. Boeta then told the inspectors that he had misspoken; that the flight had actually been operated under part 135, not part 91.
The inspectors then asked to see the operator’s OpSpecs. Boeta gave them USAC’s outdated OpSpecs, which indicated that USAC was authorized to operate N497RC in RVSM airspace. The inspectors, however, had procured USAC’s current OpSpecs from a FAA database. (At the ALJ hearing, the inspectors noted that, if they had not been aware that USAC’s current OpSpecs existed, the outdated OpSpecs that Boeta presented would have been valid.)
Within ten days following the subject flight, Boeta filed a voluntary Aviation Safety Report (“ASR”) under the FAA’s Aviation Safety Reporting System. More about this later.
B.
The FAA suspended Boeta’s air transport pilot certificate for a period of sixty days. The suspension order stated that Boeta had violated 14 C.F.R. part 91, appendix G, section (4)(b)(1), and 14 C.F.R. § 91.180(a)(1), which prohibit anyone from either filing a flight plan for, or operating a flight in, RVSM airspace unless the aircraft’s operator is authorized to do so by the FAA. The suspension order stated that Boeta, as pilot-in-command, had filed a flight plan for and operated the flight of N497RC in RVSM, even though no operator was authorized to do so at the time. Boeta appealed the FAA’s order of suspension and, after a hearing, the ALJ upheld the FAA’s order in an “initial decision.” Boeta appealed the ALJ’s decision to the National Transportation Safety Board (“NTSB”) which issued a “final decision” affirming the ALJ. Boeta now appeals the NTSB’s final decision. In this appeal, he asserts that the NTSB’s erred in ruling that the ALJ (1) properly limited Boeta’s cross-examination of several witnesses, (2) properly rejected Boeta’s defense of reasonable reliance, and (3) properly rejected Boeta’s request for a waiver of sanction under the FAA’s ASR procedure.
II.
A.
We must uphold a decision of the NTSB unless it is “unsupported by substantial evidence” or is “arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.”[12] The NTSB’s findings of fact, “if supported by substantial evidence, are conclusive.”[13] Substantial evidence is “more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.”[14] There is a “very narrow window of appellate scrutiny” for an ALJ’s credibility assessment.[15] “[A] determination of credibility is non-reviewable unless there is uncontrovertible documentary evidence or physical fact which contradicts it.” [16] We review de novo the NTSB’s resolution of purely legal questions.[17]
*642 We have reviewed the record on appeal, the briefs of the parties as supplemented and explained by counsel at oral argument, and the multi-level considerations of Boe-ta’s claims by the FAA, the ALJ, and the NTSB, and we have done so in the framework of Chevron deference and the highly deferential abuse-of-discretion, substantial evidence, and arbitrary-and-capricious standards by which our appellate consideration is cabined. This review leads us to conclude that the NTSB did not err reversibly in rejecting (1) Boeta’s assertion that the ALJ improperly limited his cross-examination of several witnesses and (2) his affirmative defense of reasonable reliance. We therefore affirm those determinations and turn to the NTSB’s denial of Boeta’s claim that he is nevertheless entitled to a waiver of sanctions under the ASR procedure.
B.
1.
Boeta insists that it was arbitrary and capricious for the NTSB to affirm the ALJ’s rejection of his affirmative defense of waiver of sanction. He asserts that any violation of the regulations was inadvertent and not deliberate on his part, entitling him to a waiver of sanctions, given his timely reporting of the incident to NASA pursuant to the FAA’s ASR procedure.
The FAA instituted the ASR procedure in 1975, with the goal of encouraging the “identification and reporting of deficiencies and discrepancies in the system.”[18] To ensure the pilot’s anonymity, the FAA has an ASR received by and processed through NASA, a neutral third party.[19] NASA reports the ASR to the FAA, but does so without identifying the pilot who filed it. (Here, the FAA was already aware of Boe-ta’s violation by virtue of the ramp check.)
“The FAA. considers the filing of a report with NASA concerning an incident or occurrence involving a violation of ... the 14 CFR to be indicative of a constructive attitude” that “will tend to prevent future violations.”[20] “[A]lthough a finding of violation may be made” after a pilot voluntarily submits an ASR, “neither a civil penalty nor certificate suspension will be imposed” if (1) the violation was “inadvertent and not deliberate,” (2) the violation did not involve a criminal offense, an accident, or action showing a lack of qualification or competency, (3) the pilot has not committed a similar violation within the previous five years, and (4) the pilot eán prove that he filed the ASR within ten days of the violation.[21] Here, the parties dispute only whether Boeta’s violation was inadvertent.[22]
2.
“Inadvertent” is neither a technical legal term nor a FAA term of art. Rather, it is a “plain vanilla” English adjective and must be interpreted here as such. According to the New Shorter Oxford English Dictionary, “inadvertent” means unintentional when modifying an action.[23] It is defined *643 variously as “not duly attentive” and “accidental; unintentional” in the American Heritage Dictionary of the English Language,[24] Inadvertent is not defined in Black’s Law Dictionary, but “inadvertence” is defined there as “an accidental oversight; a result of carelessness.”[25]
The United States Court of Appeals for the Ninth Circuit has stated that, in this context, “an inadvertent act is one that is not the result of a purposeful choice.”[26] It illustrated this principle with two examples:
[A] person who turns suddenly and spills a cup of coffee has acted inadvertently. On the other hand, a person who places a coffee cup precariously on the edge of a table has engaged in purposeful behavior. Even though the person may not deliberately intend the coffee to spill, the conduct is not inadvertent because it involves a purposeful choice between two acts — placing the cup on the edge of the table or balancing it so that it will not spill. Likewise, a pilot acts inadvertently when he flies at an incorrect altitude because he misreads his instruments. But his actions are not inadvertent if he engages in the same conduct because he chooses not to consult his instruments to verify his altitude.[27]
We conclude that whether an act — or, as here, an omission or failure to act — is “inadvertent” depends on the exact nature of the act or omission in question and the discrete facts and details of the situation. We now explain briefly our conclusion that Boeta’s failure to determine, immediately before the subject flight, whether N497RC remained eligible for operation in RVSM airspace was inadvertent for purposes of the waiver of sanction under the ASR procedure.
Here, the NTSB affirmed the ALJ’s determination that Boeta’s violation was not inadvertent. The ALJ reasoned that Boeta, as the pilot in command, had an obligation (1) to review the OpSpecs or LOA immediately before each flight and (2) to ensure that either an OpSpecs or LOA was actually in the aircraft during each flight. Had he done so, Boeta would have become aware of the change in RVSM authorization. The ALJ decided that Boeta’s failure to perform thése tasks constituted an intervening circumstance that made his otherwise inadvertent conduct advertent:
[An FAA inspector] testified that it is the responsibility of the pilot-in-command to ensure that all required documents are current and on board the aircraft before each flight. If a flight involves a flight in RVSM airspace, an RVSM authorization must be on board the aircraft, and the pilot-in-command has to review that document to determine whether or not it is current. The conduct of [Boeta] during the ramp check ... and his interactions with ... [the FAA inspectors] indicate he did not know where the proper RVSM documentation was located because he had not checked on the RVS compliance for his aircraft before the flight.... [Another FAA inspector] testified he thought [Boeta] provided a portion of the RVSM maintenance manual under the belief that the document constituted an RVSM authorization. [Boeta] did not dispute that testimony, and [Boeta]’s conduct during the ramp check does not convince *644 me or establish that his violation ... was inadvertent.
The NTSB likewise indicated:'
[Boetajs failure to verify RVSM compliance prior to take off was not inadvertent, as respondent chose not to check the status of N497RC’s RVSM authorization prior to the September 8, 2011 flight.
Again, the ALJ’s and the NTSB’s decisions that Boeta’s violation was not inadvertent focused only on (1) Boeta’s failure to review either an OpSpecs or LOA immediately before each flight in RVSM airspace, and (2) his failure to ensure that such an OpSpecs or LOA was physically in the aircraft during the flight. It did not consider any other surrounding circumstances.[28]
These reasons, however, do not withstand scrutiny. As we discuss below, the ALJ and NTSB erred in their determination that Boeta had an obligation (1) to review any OpSpecs or LOA before each flight or (2) to ensure such a OpSpecs or LOA was in the aircraft during each flight. Without any intervening obligation to perform either of those tasks, during which Boeta would have become aware of the change in the RVSM authorization, his conduct would remain inadvertent.
In reaching its decision, the ALJ noted that an FAA inspector stated at the hearing that the pilot is always responsible for verifying that an operator is authorized for RVSM operations by actually consulting the authorization in an operator’s OpSpecs or LOA. Even though this assertion was made on the basis of the inspector’s personal, not expert, knowledge, the ALJ cited it in determining that Boeta, as the pilot in command, had such a responsibility. The ALJ, however, did not cite any other source for this responsibility.
If such an obligation existed, it would likely have been included within the regulations that enumerate the authorizations a pilot in command must consult before each flight. But such an obligation does not appear in these regulations.[29] To the contrary, in its advisory circular supplying the RVSM operating practices and procedures, the FAA states that a pilot must “verif[y] that the aircraft is approved for RVSM operations,” but does not state that the pilot must verify that the operator is authorized for such operations.[30] By its own *645 assertion, this circular, “describes an acceptable means ... for authorization of aircraft and operators to conduct flight in airspace or on routes where RVSM is applied.” [31] Like the regulations, this circular does not require that the pilot actually consult any LOA or OpSpecs immediately before operating in RVSM airspace.[32]
The regulations also make it clear that a pilot, once aware that the authorization exists in the operator’s OpSpecs, has no ongoing obligation to confirm that it remains current and therefore valid. Instead, 14 C.F.R. § 119.43, which applies to part 135 commercial operators like USAC,[33] states that the operator is responsible for “keepfrng] each of its employees and other persons used in its operations informed of the provisions of its [OpSpecs] that apply to that employee’s or person’s duties and responsibilities.”[34] The pilot is not responsible for keeping himself informed. He must rely on the operator for the current OpSpecs.
It is undisputed that Boeta had, at some earlier point, consulted the authorization in USAC’s outdated OpSpecs. USAC issued Boeta its “operations manuals,” which included its then-current OpSpecs.[35] He was certainly aware, that, at some point, USAC’s outdated OpSpecs permitted him to pilot N497RC in RVSM airspace. The ALJ’s determinations, as affirmed by the NTSB, bolster this.
It is generally understood that an existing condition is presumed to continue in existence, absent some indication that it has ceased or substantially changed.[36] When USAC terminated its agreement with USAC, its chief pilot called Boeta several times, but Boeta did not answer or return his calls.[37] By the chief pilot’s account, USAC never terminated its agency relationship with Boeta. The chief pilot conceded as much at the ALJ’s hearing. Accordingly, Boeta remained USAC’s agent even after the agreement between USAC and Capital concluded. As a result, USAC had a continuing obligation to keep Boeta informed of the changes in its Op-Specs that applied to his duties and re- *646 sponsibilities as a pilot.[38] This obligation would not have existed had USAC simply-terminated its agency relationship, which it might have accomplished by sending written notice to Boeta at the address on his application to USAC or even the address in the FAA’s registry.[39]
As the NTSB itself noted, an FAA inspector stated that “without more, someone reading the [USAC’s outdated] Op-Specs ... would conclude N497RC was still approved for RYSM operations.”[40] There is no indication in the record that USAC' — nor Capital or Redi-Carpet, for that matter — expressly informed Boeta that he was relying on outdated OpSpecs. As far as Boeta was concerned, nothing had changed with regard to him, to any of those entities, or to N497RC itself.[41] The authorization contained in USAC’s outdated OpSpecs, would have allowed USAC to operate N497RC commercially for Redi-Carpet’s benefit under part 135, provided that USAC’s dry lease was still in effect. Alternatively, that authorization would have allowed USAC to operate N497RC noncommercially for Redi-Carpet’s benefit under part 91, even after the dry lease had ended. As the FAA states, “[o]perators issued OpSpecs are not required to also obtain an LOA for those operations when they are conducted under part 91, provided that,” among other things, “[t]he aircraft is operated under the operator name listed on the OpSpecs.”[42] The absence of USAC’s dispatch sheet was Boeta’s only indication that USAC might not be operating the flight.
USAC, Capital, and Redi-Carpet were in much better positions to determine who had possession of and operational control over N497RC. Boeta was largely ignorant of the shifts in those entities’ respective relationships. Although Boeta might have done more to inquire of them, they certainly should have done more to inform him of how those shifts affected his authority to operate N497RC for them.
More to the point, USAC, which had an obligation to inform Boeta of changes to its OpSpecs, should not have merely assumed that Boeta would notice the distinction between its dispatch sheet and Capital’s trip sheet. Boeta understood that USAC was consulting with Capital on obtaining its certificate under part 119, and he must have understood that at some point USAC would transfer operational control from itself to Capital to allow that process to occur. USAC should have provided clear and unambiguous notice to Boeta. We can only speculate that USAC’s motive is not so informing Boeta was its quarrel with Capital, which remained Boeta’s employer throughout.
Boeta urges that Administrator v. *647 Meacham,[43] supports the conclusion that his conduct was inadvertent. In Meacham, an aircraft ran out of fuel four miles from its destination after the pilot failed to check the fuel levels in each tank visually before the flight.[44] When the aircraft ran out of fuel, the gauges showed the fuel level in one tank was empty and the other was almost full. The NTSB determined that the pilot’s failure to check the tanks was at least partly justified by the circumstances. The pilot had been the last person to refuel the aircraft, knew how much fuel had been added, knew how long he had flown the aircraft, and knew that one of the fuel gauges was inoperative.[45] The NTSB also suggested that the reason the fuel level was low might have been because someone siphoned it.[46]
Any difference between Boeta’s failure to reinspeet the RVSM authorization and the Meacham pilot’s failure to reinspect the fuel level did not rise to the level of a distinction. Any inadvertence was the result of, at least in part, the improper acts or omissions of others. Like the pilot in Meacham, Boeta inadvertently relied on what he understood to be an unchanged condition. He is entitled to the waiver-of-sanction defense under the provisions of the FAA’s ASR procedure.
Although we are aware of the danger posed by unauthorized RVSM flight, we are also cognizant of the need, recognized by Congress, for pilots to freely disclose violations to the FAA. Such disclosure allows the FAA to resolve problems before they result in accidents. Pilots will be less likely to participate if, after complying with the ASR procedure, they are not afforded the promised protections. Boeta’s violation was malum prohibitum, not ma-lum in se: He knew that he was adequately trained, and that N497RC was adequately equipped, to operate safely in RVSM airspace, but he was mistaken in believing that they were permitted to do so on the date of the flight in question.
III.
We are no less sensitive to air safety concerns than the FAA, the ALJ, and the NTSB. But candidly, it defies common sense to conclude that Boeta was anything but inadvertent when he, as a pilot capable of flying in restricted airspace, flew an airplane capable of flying in restricted airspace, without checking the paperwork evidencing that the operator (not the pilot!) of that craft was still authorized to commission such flights. This is especially so when viewed in the context of the agencies’ conclusion that the pilot in Meacham — who “forgot” to check his fuel level before taking off, with the potential of causing a true disaster (not merely a paperwork glitch)— was inadvertent.
For the forgoing reasons, we hold that the NTSB’s decision affirming the ALJ’s rejection of Boeta’s defense of waiver of sanction under the ASR procedure was arbitrary and capricious as a matter of law. We therefore REVERSE those rulings and RENDER judgment that Boeta is entitled to waiver of all sanctions — expressly including the sixty days suspension of his air transport pilot certificate — by virtue of his timely compliance with the FAA’s ASR procedure; and we REMAND this matter to the NTSB with instructions to expunge its suspension of Boeta’s said certificate and to take any other steps that *648 might be required to complete these proceedings, consistent with the opinion.
REVERSED, RENDERED, and REMANDED with instructions.

.Tn this context, an aircraft is operated ''commercially” only when it is used in air commerce. For instance, when "conducting passenger-carrying flights for compensation or hire.” 14 C.F.R. §91.147; see 14 C.F.R. § 1.1 ("Commercial operator means a person who, for compensation or hire, engages in the carriage by aircraft in air commerce of persons or property.... Where it is doubtful that an operation is for 'compensation or hire’, the test applied is whether the carriage by air is merely incidental to the person’s other business or is, in itself, a major enterprise for profit.”).

. 14 C.F.R. §1.1.

. Truth in Leasing, FAA Advisoiy Circular No. 91-37A (1978), http://www.faa.gov/document Library/media/Advisory_Circular/AC91-37A. pdf; see Legal Interpretation to Eric L. Johnson, from Rebecca B. MacPherson, Assistant Chief Counsel for Regulations (Aug. 11, 2011), http://www.faa.gov/about/office_org/ headquarters_offlces/agc/poLadjudication/agc 200/interpretations/data/interps/2011/johnson-johnson% 20-% 20% 282011. % 201egal% 20in-terpretation.pdf.

. Capital could operate N497RC noncommer-cially for Capital’s own use under part 91 because it would have taken possession of it through the dry léase. Stated differently, Capital would have assumed the rights and obligations of Redi-Carpet, the owner.

. 14 C.F.R. § 119.33(a), (b).

. Id.

. 14 C.F.R. § 119.49(a)(4).

. USAC’s operation manual states: "All crew-members are direct employees or agents for all aspects of Part 135 operations.” Likewise, its OpSpecs provide: "The significance of the words 'agent' and 'agents' as used in these operations specifications is that the certificate holder is the principal and that the certificate holder is accountable and liable for the acts or omissions of each of its agent or agents.”

. Authorization of Aircraft and Operators for Flight in Reduced Vertical Separation Minimum Airspace, FAA Advisory Circular No. 91-85 (2009); see 14 C.F.R. pt. 91, app. G. ("Within RVSM airspace, air traffic control (ATC) separates aircraft by a minimum of 1,000 feet vertically between flight level (FL) 290 and FL 410 inclusive.”).

. 14 C.F.R. pt. 91, app. G.

. 14 C.F.R. pt. 91, app. G, sec. 3.

. 5 U.S.C. § 706(2)(A),(E); see Miranda v. Nat’l Transp. Safety Bd., 866 F.2d 805, 807 (5th Cir. 1989).

. 49 U.S.C. §§ 1153(b)(3), 46110(c).

. Ellis v. Liberty Life Assur. Co. of Bos., 394 F.3d 262, 273 (5th Cir. 2004).

. Miranda, 866 F.2d at 807.

. Id.

. See Kratt v. Garvey, 342 F.3d 475, 480 (6th Cir. 2003) (collecting cases); cf. Pool Co. v. Cooper, 274 F.3d 173, 177 (5th Cir. 2001).

. Aviation Safely Reporting Program, FAA Advisory Circular No. 00-46E (2011).

. Id.

. Id.

. Id.

. The parties agree that the violation was "not deliberate,” but for immunity to apply, a pilot must establish that his actions were both not deliberate and inadvertent. See Adm’r v. Ricotta, NTSB Order No. EA-5593, at *2 (2011); Ferguson v. Nat'l Transp. Safety Bd., 678 F.2d 821, 828 (9th Cir. 1982).

. Inadvertent, New Shorter Oxford English Dictionary (1993).

. Inadvertent, American Heritage Dictionary of the English Language (1976).

. Inadvertence, Black’s Law Dictionary (10th ed. 2014).

. Ferguson, 678 F.2d at 828.

. Id.

. Judge Higginson, in his dissent, suggests that we also consider whether "Boeta ignored surrounding circumstances of the invalidity of the flight's RVSM authorization.” This would require us to do what he warns against. As he notes, "review of NTSB decisions is circumscribed and highly deferential.”

. See, e.g., 14 C.F.R. § 91.9(b) ("No person may operate a U.S.-registered civil aircraft ... unless there is available in the aircraft a current, approved Airplane or Rotorcraft Flight Manual....”); 14 C.F.R. §91.103 ("Each pilot in command shall, before beginning a flight, become familiar with all available information concerning that flight [including] weather reports and forecasts, fuel requirements, alternatives available if the planned flight cannot be completed, and any known traffic delays of which the pilot in command has been advised by ATC....”); 14 C.F.R. §91.203 ("[N]o person may operate a civil aircraft unless it has within it ... [a]n appropriate and current airworthiness certificate ... [and a]n effective U.S. registration certificate....”); 14 C.F.R. § 91.503 ("The pilot in command of an airplane shall ensure that the following flying equipment and aeronautical charts and data, in current and appropriate form, are accessible for each flight at the pilot station of the airplane: ... [a] cockpit checklist containing the procedures^] ... [p]ertinent aeronautical charts[, and] ... each pertinent navigational en route, terminal area, and approach and letdown chart.”); see 14 C.F.R. §23.1589.

.Authorization of Aircraft and Operators for Flight in Reduced Vertical Separation Minimum Airspace, FAA Advisory Circular No. 91-85.

. Id.

. It also raises a question as to whether the pilot even needs to verify that the operator is authorized.

. 14 C.F.R. § 119.1; 14 C.F.R. § 119.5.

. 14 C.F.R. § 119.43(c).

. USAC trained Boeta to operate in RVSM airspace and an FAA inspector tested him on his knowledge and ability in that regard. Additionally, Boeta was aboard N497RC during USAC’s proving runs, when an FAA inspector tested its capability.

. Cent. Pac. Ry. Co. v. Alameda Cty., Cal., 284 U.S. 463, 468, 52 S.Ct. 225, 76 L.Ed. 402 (1932) (noting "the general principle that a condition once shown to exist is presumed to continue.”); see 31A C.J.S. Evidence § 216 ("Proof of the existence at a particular time of a fact or condition of a continuous nature gives rise to an inference, within logical limits, that it exists at a subsequent time.”); see e.g., Swift t& Co. v. United States, 343 U.S. 373, 382-83, 72 S.Ct. 716, 96 L.Ed. 1008 (1952); Lewis v. Hawkins, 90 U.S. 119, 126, 23 Wall. 119, 23 L.Ed. 113 (1874); Mitchell v. United States, 88 U.S. 350, 353, 21 Wall. 350, 22 L.Ed. 584 (1874); In re Baigorry, 69 U.S. 474, 480, 2 Wall. 474, 17 L.Ed. 880 (1864). But see Maggio v. Zeitz, 333 U.S. 56, 65, 68 S.Ct. 401, 92 L.Ed. 476 (1948) ("Language can, of course, be gleaned from judicial pronouncements and texts that conditions once existing may be presumed to continue until they are shown to have changed. But such generalizations, useful enough, perhaps, in solving some problem of a particular case, are not rules of law to be applied to all cases, with or without reason.”).

.Boeta disputed this, stating that the chief pilot had never called him. The ALJ, however, credited the chief pilot's account, and we do not disrupt this determination.

. See 14 C.F.R. § 119.43(c).

. See Airman Inquiry, Federal Aviation Administration, https://amsrvs.registry.faa.gov/ airmeninquiry/.

. Even so, the NTSB disregarded this, remarking that the same inspector stated that "a pilot would have had other methods, in addition to the OpSpecs, available to determine if an aircraft was authorized for RVSM operations.” Certainly, however, the regulations and circular do not require a pilot to do more than review the authorization itself.

. Although Boeta’s violation was inadvertent and therefore excused by the waiver-of-sanction defense, it was not excused by the reasonable reliance defense because, in part, he had “reason to question” USAC’s silence.

. Authorization of Aircraft and Operators for Flight in Reduced Vertical Separation Minimum Airspace; FAA Advisory Circular No. 91-85.

. Garvey v. Meacham, NTSB Order No. EA-4633 (1998).

. Id.

. Id.

. Id.