1330

Bob VIEUX; Joyce Vieux; Donald Vieux, Executor of Zwissig Estate; Ralph Pombo; Bob Frick; Gordon Griffith; Marianne Griffith; Kathleen Brockman; Nancy Burr; Miguel Franco; Joe Jess; Paul Marciel; Don Scullion, Executor of Greeley Estate; Antonio Martin; Don Brooks; Edward Depaoli; Ray Peterson; Antonette Egan; Ferma Corporation, a California corporation; Rancho Arroyo De La Alameda, a general partnership, Plaintiffs–Appellants,

v.

EAST BAY REGIONAL PARK DISTRICT, a body politic, Defendant–Appellee.

Bob VIEUX; Joyce Vieux; Donald Vieux, Executor of Zwissig Estate; Ralph Pombo; Bob Frick; Gordon Griffith; Marianne Griffith; Kathleen Brockman; Nancy Burr; Miguel Franco; Joe Jess; Paul Marciel; Don Scullion, Executor of Greeley Estate; Antonio Martin; Don Brooks; Edward Depaoli; Ray Peterson; Antonette Egan; Ferma Corporation, a California corporation; Rancho Arroyo De La Alameda, a general partnership, Plaintiffs–Appellants,

v.

EAST BAY REGIONAL PARK DISTRICT, a body politic, Defendant,

and

County of Alameda, a political division of the State of California; Southern Pacific Transportation Company, a Delaware corporation; Santa Fe Pacific Realty Corporation, a Delaware corporation; Robert T. Knox; and John George, Defendants–Appellees.

Nos. 87–2509, 87–15171.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Dec. 15, 1988.

Opinion Jan. 10, 1990.

Opinion Withdrawn June 26, 1990.

Decided June 26, 1990.

Joseph M. Gughemetti, Joseph M. Gughemetti, A Professional Corp., San Mateo, Cal., for plaintiffs-appellants.

Les A. Hausrath, Wendel, Rosen, Black, Dean & Levitan, Oakland, Cal., for defendant-appellee East Bay Regional Park Dist.

John R. Reese, McCutchen Doyle Brown & Enersen, San Francisco, Cal., for defen-

dants-appellees County of Alameda, Southern Pacific Transp. Co., Santa Fe Pacific Realty Corp., Robert T. Knox, and John George.

Before FERGUSON, BRUNETTI and LEAVY, Circuit Judges.

## ORDER

The opinion filed January 10, 1990 is withdrawn.

The panel voted to deny the petition for rehearing and reject the suggestion for rehearing en banc.

The full court has been advised of the suggestion for en banc rehearing, and no judge of the court has requested a vote on the suggestion for rehearing en banc. Fed. R.App.P. 35(b).

The petition for rehearing is DENIED and the suggestion for a rehearing en banc is REJECTED.

## OPINION

BRUNETTI, Circuit Judge:

### I.

### BACKGROUND

A. *Overview.*

This case is a consolidation of two appeals. Appellants are rural landowners whose properties adjoin or are bisected by railroad rights of way located along Niles Canyon and Altamont Pass in Alameda County, California ("landowners"). Appellees are the County of Alameda, two members of the County's Board of Supervisors ("County"), Southern Pacific Transportation Company, Santa Fe Pacific Realty Corporation ("Southern Pacific") and the East Bay Regional Park District ("Park District"). Appellants contend that the railroad abandoned its rights of way and the reversionary rights should fall to them. The district court first granted summary judgment in favor of East Bay Regional Park District and appellants appealed in

No. 87–2509. The district court then tried only the issue of abandonment relating to the remaining defendants. The district court found no abandonment and, finding that issue dispositive of all other issues, rendered judgment in favor of the remaining defendants. Appellants appealed in action No. 87–15171.

B. *Standard of Review.*

The courts of appeals review a district court's granting of summary judgment de novo. *National Basketball Ass'n v. SDC Basketball Club*, 815 F.2d 562, 565 (9th Cir.), *cert. dismissed*, 484 U.S. 960, 108 S.Ct. 362, 98 L.Ed.2d 386 (1987). All "evidence and factual inferences" are reviewed in the light most favorable to the nonmoving party. *State of Alaska v. United States*, 754 F.2d 851, 853 (9th Cir.), *cert. denied*, 474 U.S. 968, 106 S.Ct. 333, 88 L.Ed.2d 317 (1985). Summary judgment must be upheld if no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *Id.*

The district court found that whether Southern Pacific had abandoned the right of way and if so, when the abandonment occurred was an issue of fact. The district court's findings of fact, whether based on oral or documentary evidence, shall not be set aside unless clearly erroneous, and due regard will be given to the opportunity of the district court to judge the credibility of the witnesses. Fed.R.Civ.P. 52(a). A district court's determination of questions of mixed law and fact that implicate constitutional rights are reviewed de novo. *Id.*

C. *Factual Background.*

Southern Pacific's predecessors, Central Pacific Railway Company and Central Pacific Railroad Company, acquired the rights of way involved in this case as part of the federal land grants made under the Acts of July 1, 1862 (12 Stat. 489) and July 3, 1864 (13 Stat. 356). *Central Pac. Ry. Co. v. Alameda County*, 284 U.S. 463, 465, 52 S.Ct. 225, 226, 76 L.Ed. 402 (1932). The property interest that the railroads received before 1871 has been referred to as a "limited fee, with right of reverter."

*Idaho v. Oregon Short Line R.R. Co. (Idaho I)*, 617 F.Supp. 207, 210–12 (D.Idaho 1985). After 1871, the government granted the railroads a lesser interest in the property, often referred to as an exclusive use easement. *See United States v. Union Pac. R.R. Co.*, 353 U.S. 112, 119, 77 S.Ct. 685, 689, 1 L.Ed.2d 693 (1957); *Great N. Ry. Co. v. United States*, 315 U.S. 262, 273–76, 62 S.Ct. 529, 533–35, 86 L.Ed. 836 (1942). The railroads have used these rights of way continuously until the dispute between the parties here arose.

Beginning in October, 1981, Southern Pacific began a several-year process of consolidating its tracks with Western Pacific Railroad's parallel tracks in the same area. The two railroads signed an agreement on October 12, 1981. To facilitate this project, Southern Pacific filed a Notice of Exemption pursuant to 49 U.S.C. § 10505 (1982) [1] from abandonment proceedings with the Interstate Commerce Commission ("I.C.C."), asking to be excused from the regular procedures due to the insubstantial nature of the transaction and the minimal impact the changes would have on railroad employees, customers and the amount of transportation in the area. 49 U.S.C. § 10903 (1982 & Supp. II 1984). The exemption application states in relevant part that:

> SPT would not exercise its abandonment exemption authority, if granted, *until and unless* the SPT–WP [Southern Pacific–Western Pacific] trackage rights agreement had been approved by the Commission.

(Emphasis added.) On September 13, 1982, the I.C.C. published a Notice of Exemption which states in relevant part:

> SOUTHERN PACIFIC TRANSPORTATION COMPANY—ABANDONMENT AND ACQUISITION OF TRACKAGE RIGHTS OVER THE WESTERN PACIFIC RAILROAD COMPANY
>
> The purpose of the transaction is to eliminate redundant parallel trackage and share the costs of the remaining trackage. Under the proposed relocation project SPT *will abandon* its line of rail-

road from milepost 29.09 at Niles, CA, to milepost 66.5 near Tracy in Alameda and San Joaquin, CA (Niles line). *Concurrently*, SPT will acquire trackage rights over the parallel WP track which will allow SPT to operate between Niles and Lathorp, CA....

> As a condition to the use or exemption, SPT has proposed that any employees affected by the transaction be protected by the conditions set forth in *Oregon Short Line....* Since the relocation project involves not only an abandonment but a trackage rights transaction, we must also impose the conditions set forth in *Norfolk and Wester Ry Co.* (citations omitted). Together these conditions satisfy the statutory requirements of 48 U.S.C. 10505(g)(2).

(Emphasis added.) *See* 49 C.F.R. 1152.-50(d)(3) (1988). In the winter of 1983, storms damaged parts of the track in Southern Pacific rights of way; thereafter Southern Pacific used portions of that track for storage.

Alameda County and Southern Pacific entered an agreement transferring the rights of way to the County in April, 1985. The County Board of Supervisors ratified this agreement on April 23, 1985. The agreement provided that Southern Pacific quitclaim the Niles Canyon and Altamont Pass rights of way to Alameda County. In exchange, the County agreed to place the property into the County's highway system to be used for highway and/or transportation related facilities to comply with 43 U.S.C. § 912 (1982). The County also agreed to grant to the railroad a fiber optic cable easement and a pipeline easement along, over, and under those portions of the Niles Canyon property, and a fiber optic cable easement along, over and under the Altamont Pass property. The County promised to indemnify the railroad against any loss of the easement and to provide another easement should this one be lost. The County assumed liability for all drain-

---

**1.** Section 10505 excepts compliance with provisions of 49 U.S.C. §§ 10903–10907 (1982 & Supp. II 1984), when the provisions are (1) not necessary to carry out transportation policy, and (2) either (a) the transaction or service is of limited scope or (b) the application of provisions are not needed to protect shippers from the abuse of market power.

age facilities, culverts, structures, bridges and tunnels including liability for their removal. The railroad retained a license to use the property as a training ground through July, 1985 and to enter the property within a year following this agreement to remove any rails, ties and gravel. The railroad retained liability as to these activities. The railroad continued to use the rights of way through the summer of 1985, when they completed consolidation with Western Pacific. For example, the railroad used the rights of way for training purposes and storage of railroad cars, and continued to classify the rights of way as operating property, and paid taxes on them. *Vieux v. County of Alameda,* 695 F.Supp. 1023, 1030–31 (N.D.Cal.1987). Southern Pacific removed the rails, ties and gravel between the summers of 1985 and 1986. *Id.* at 1032.

In order to comply with the California Environmental Quality Act (CEQA), Cal. Pub.Res.Code § 21000–21165 (West 1986 & Supp.1989), on April 12, 1985, the County published a notice of its intention to adopt a Negative Declaration. *See* Cal.Pub.Res. Code § 21092 (West 1986). This notice stated that the Negative Declaration could be reviewed at the County Public Works Agency. The Board of Supervisors adopted the Negative Declaration before approval of the agreement with Southern Pacific. The Director of Public Works found that the acquisition of the donated land and the grant of the easements would cause no substantial adverse change in the environment because the County contemplated no construction at the time. The County did not hold any public hearings on either the agreement before it was executed or on its environmental impact.

The Park District's interest and involvement in the Niles Canyon [2] area stems from 1973, when the first portion of the Alameda County Creek Regional Trail was completed. In 1976, the Park District Board of Directors (the Board) adopted a trail plan which included the Niles Canyon area. Subsequently the Board decided to propose development of a recreational trail in the Niles Canyon Corridor and a study and environmental impact report (EIR) were prepared and circulated in 1979. The Board accepted a final proposal and EIR on the area in February, 1980. The Park District at this time neither owned nor held any real property interests in the Niles Canyon area. During 1980 and 1981, the Park District made contacts with Southern Pacific to discuss use of the area for recreational trail purposes. The Park District has never acquired an interest or entered into an agreement with Southern Pacific concerning the proposed trail and Niles Canyon area. In 1984, the Park District attempted to have legislation passed by Congress transferring Southern Pacific's interest in the rights of way to the Park District for recreational uses. This proposal died in committee. Also during 1984, Southern Pacific approached the adjoining landowners (appellants) to negotiate a fiber optics easement on each property in exchange for conveying the property or abandoning it.

After their initial efforts to obtain rights to put a trail through Niles Canyon, the Park District learned that Southern Pacific was considering a possible transfer to Alameda County. The Park District expressed its interest to both the railroad and to the County in obtaining a license for trail purposes. Southern Pacific indicated to the Park District that several impediments prevented the railroad from conveying an interest to the Park District. For example, in the absence of congressional approval of a conveyance as provided in 43 U.S.C. § 912, the rights of way to be abandoned could only be conveyed to a state, county or municipality for use as a "public highway or street." 43 U.S.C. §§ 912, 913 (1982). The Park District was not an entity to whom the transfer could be made and the trail was not a "public highway or street." The railroad also wanted an easement for a fiber optics cable in exchange for the rights of way. The Park District was not a party to the County's agreement with Southern Pacific nor did it participate

---

2. The rights of way in the Altamont Pass area are not within the jurisdictional boundaries of the Park District, and it has never sought to develop recreational trails there.

in the negotiations which formed it. The Park District at this time holds no actual or proposed real property interest in the rights of way, nor did it reach any agreement with Alameda County concerning the rights of way. There has been no construction on the rights of way.

### D. Posture of the Case.

Appellants' first amended complaint dated May 21, 1985, alleged violations of 42 U.S.C. §§ 1983 and 1985 (1982) (Federal Civil Rights Act), 43 U.S.C. § 912 (Public Lands Act), 47 U.S.C.A. §§ 151–613 (1962 & Supp.1989) (Communications Act of 1934) and sought damages and declaratory relief. *Vieux*, 695 F.Supp. at 1024. Appellants also moved for a writ of mandate July 11, 1985, under Cal.Civ.Proc. §§ 1085 and 1094.5 (allowing for review of administrative orders to compel ʹor enjoin acts); a declaration of quiet title under federal and state law; damages against the County Supervisors for waste of, and injury to, taxpayers' assets, property, and funds under Cal.Civ.Proc. § 526a; declaratory and injunctive relief; and attorneys' fees under 42 U.S.C. § 1988 (1982), Cal.Civ.Proc. § 1021.5 (1986) and Cal.Gov.Code § 54960.5 (1983) (Brown Act). *Vieux* at 1024–25. Appellees then moved to dismiss the action. The district court denied both appellants' petition for writ of mandamus and appellees' motion. The district court bifurcated the action into a trial on the liability and title questions and then a trial on damages if liability existed. After extensive discovery, all defendants moved for summary judgment; the district court dismissed the Park District from the action but denied the motion for summary judgment as to the other defendants. Because appellants had conceded that certain causes of action no longer existed against the Park District, the court in its Memorandum and Order of January 29, 1987 discussed only the causes of action against the Park District under 42 U.S.C. § 1983 and the quiet title under federal and state law. The court found that plaintiffs-appellants had failed to meet their burden under Fed.R.Civ.P. 56(e) and *Celotex v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), in opposing the Park District's motion for summary judgment. The court also found that the quiet title actions were not ripe because the Park District had no present interest in the rights of way. Appellants appealed that decision in Appeal No. 87–2509.

Before trial, the district court dismissed the § 1985 action against all defendants except the County, dismissed the Writ of Mandate, and appellants' conceded their claim under the Cable Communications Act was no longer applicable. *Vieux* at 1025. The district court found that appellants had raised genuine issues of fact as to whether the railroad had abandoned the right of way and set that issue for trial. In its opinion and order of September 29, 1987, the district court found for defendants on all issues, *Vieux*, 695 F.Supp. 1023, finding no abandonment and that this issue was dispositive of all others. *Id.* at 1032–33. The district court entered judgment on November 30, 1987 in favor of all remaining defendants and subsequently denied appellants' motion for reconsideration. Appellants appealed in Appeal No. 87–15171, which was consolidated with No. 87–2509.

## II.

## DISCUSSION

### A. Reversionary Rights Under § 912

In 1922, Congress passed 43 U.S.C. § 912 (Disposition of Abandoned Railroad Grants) as part of the Public Lands Act to ensure that railroad rights of way would continue to be used for public transportation purposes. *Idaho I* at 212–13. Although the U.S. Supreme Court has not addressed whether the change in 1871 in the nature of the grants, from "limited fee with right of reverter" to "exclusive easement," affects the application of § 912, we agree with the district court's Memorandum and Order of March 2, 1987, in that the statute applies to grants both before and after 1871. *See Idaho I* at 212–13; *Wyoming v. Andrus*, 602 F.2d 1379, 1382–83 (10th Cir.1979).

Section 912 in pertinent part provides:

Whenever public lands of the United States have been or may be granted to any railroad company for use as a right of way for its railroad ... and *use and occupancy* of said lands for such purposes *has ceased* or shall hereafter cease, ... *by abandonment* by said railroad company *declared or decreed by a court of competent jurisdiction or by Act of Congress*, then and thereupon all right, title interest, and estate of the United States in said lands shall, *except* such part thereof *as may be embraced in a public highway legally established within one year* after the date of said decree or forfeiture or abandonment be transferred to and vested in any person, firm, or corporation, assigns, or successors in title and interest to whom or to which title of the United States may have been or may be granted....

43 U.S.C. § 912 (emphasis added).

Appellant landowners argue that the I.C.C. exemption was a decree by an "Act of Congress" that the railroad had abandoned their rights of way, and that no other test needs to be met, thus triggering landowners' reversionary rights under § 912. Under appellants' theory, they became entitled to reversionary land interests in the rights of way when on September 13, 1982, the I.C.C. approved the railroad's relocation onto Western Pacific trackage and the abandonment of its lines at Niles and Altamont Pass. *Vieux* at 1025. They further claim that the establishment of a highway by the County does not save the rights of way from reverting, because if the abandonment occurred in 1982, the highway would have been established in excess of one year after abandonment. Appellees, on the other hand, maintain that the I.C.C. "Notice of Exemption" was not a decree by an "Act of Congress" and that no abandonment had occurred, thus appellants' rights were never triggered under § 912. Appellees also maintain that when the railroad quitclaimed the rights of way to the County for the establishment of a public highway, this action extinguished any claim appellants may have had to the rights of way, thus disposing of the remaining causes of action. *Id.*

After the district court dismissed the Park district from the action, it determined five claims for relief remained for trial: 1) under the Public Lands Act (43 U.S.C. § 912); 2) under the Federal Civil Rights Act (42 U.S.C. § 1983); 3) the quiet title action; 4) the taxpayers' suit; 5) declaratory and injunctive relief. The district court concluded that the issue of abandonment under the Public Lands Act would be dispositive of all other issues, because without abandonment, plaintiffs had no interest in the rights of way. If plaintiffs had no interest in the land and without abandonment had no right or interest to assert, then they would have no standing for the civil rights, quiet title or other causes of action.

The district court tried the issue of abandonment with evidence in the form of declarations and exhibits. The district court, noting the dearth of case law construing 43 U.S.C. § 912 and the issue of abandonment, adopted a test formulated by Chief Judge Callister of the U.S. District Court in Idaho. *Vieux* at 1027; *Idaho v. Oregon Short Line R.R. Co. (Idaho II),* 617 F.Supp. 213, 216 (D.Idaho, 1985). First, the court determined that 43 U.S.C. § 912 applied to the grants on the property in dispute here. *See Idaho I,* 617 F.Supp. at 212. Second, the district court stated that, under § 912, the test for abandonment is (a) "that 'use and occupancy' of the railroad right of way for railroad purposes must cease in order for abandonment to occur" *and* (b) there must be "a decree by a court or a congressional act that abandonment has occurred." *Idaho II,* 617 F.Supp. at 216, 218; *Vieux,* 695 F.Supp. at 1028. Last, in interpreting the statute, the district court looked first to the "plain and apparent meaning" of the terms of the statute and then turned to the common law principles of abandonment for guidance. *Vieux,* 695 F.Supp. at 1027–28; *Idaho II,* 617 F.Supp. at 217.

The district court found that if there was abandonment, it occurred in April, 1985 or afterwards. The district court further found that the County established a public highway within one year of that date, and

[t]hus, neither the exception nor the rule set forth in § 912 applies, and plaintiffs were not, and are not entitled to any reversionary right, title, interest, or estate in the rights-of-way.

*Vieux* at 1032. We affirm the district court but find that the exception to § 912 does apply and cuts off any interest the landowners may have had in the rights of way.

 The interpretation of 43 U.S.C. § 912 is a question of first impression for this circuit. We adopt the test formulated in *Idaho II* and used by the district court below for the interpretation of § 912. In order for reversionary rights to vest under § 912, the railroad must 1) cease "use and occupancy" of the rights of way *and* 2) abandonment must be "declared or decreed" by a court of competent jurisdiction or a congressional act. *Idaho II*, 617 F.Supp. at 216, 218. Those vested reversionary rights are subject to divestment under the Section 912 "exceptions" clause which provides that [declared or decreed] abandoned rights of way vest in the reversionary landowners "except such part thereof as may be embraced in a public highway legally established within one year after the date of said decree *or* forfeiture *or* abandonment...." 43 U.S.C. § 912 (emphasis added). Under the exceptions clause, non-vested reversionary rights can be extinguished if a public highway is legally established within one year of a decree of abandonment or forfeiture or abandonment.

We will first address the question of whether there was an "Act of Congress" and determine whether there was a cessation of use and occupancy by the railroad. Then, we will look to the exceptions clause to analyze the County procedures in establishing a legal highway.

*1. Decree by a Court or Act of Congress.*

 Appellants argue that the I.C.C.'s Notice of Exemption was a decree by an "Act of Congress." They cite *Chicago & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 101 S.Ct. 1124, 67

L.Ed.2d 258 (1981) which held that Congress gave the I.C.C. the exclusive authority to regulate and determine a carrier's decision to abandon its lines and cease it services as "critical to the congressional scheme, which contemplates comprehensive administrative regulation of interstate commerce." *Id.* at 321, 101 S.Ct. at 1132. The U.S. Supreme Court further emphasized that

> The breadth of the Commission's statutory discretion suggests a congressional intent to limit judicial interference with the agency's work.... Congress granted to the Commission plenary authority to regulate ... rail carriers' cessations of service on their lines. And at least as to abandonments, *this authority is exclusive.*

*Id.* at 321–23, 101 S.Ct. at 1132–33 (emphasis added). Although the Supreme Court noted the exclusive authority of the I.C.C. to determine whether a carrier could abandon services, it is unclear from the case law whether an exemption from the regular abandonment procedures is a decree of abandonment under § 912. We hold that there was no such decree by a court or an Act of Congress here.

*a. I.C.C. Exemption from Abandonment*

The Staggers Act sets forth a comprehensive scheme of procedures and standards for abandonments of rail lines. *Illinois Commerce Comm'n v. I.C.C.*, 787 F.2d 616, 621 (D.C.Cir.1986). A railroad may abandon part of a rail line or transfer a rail line only if the I.C.C. "finds that the present or future public convenience and necessity require or permit the abandonment or discontinuance." 49 U.S.C. § 10903(a); *Railway Labor Executives' Ass'n v. I.C.C.*, 825 F.2d 238, 239 (9th Cir. 1987). The burden is on the railroad applying for the certificate of abandonment to show that the present or future public convenience and necessity require or permit the abandonment. 49 U.S.C. § 10904(d)(1); *Black v. I.C.C.*, 737 F.2d 643, 650 (7th Cir.1984); *Cartersville Elevator, Inc. v. I.C.C.*, 724 F.2d 668 (8th Cir.1984), adhered to by 735 F.2d 1059 (en banc) (1984). The

regulations also require the railroad to satisfy a lengthy set of procedural prerequisites and to present specific and accurate cost/revenue data. *City of Cherokee v. I.C.C.,* 641 F.2d 1220, 1228 (8th Cir.), *cert. denied,* 454 U.S. 892, 102 S.Ct. 387, 388, 70 L.Ed.2d 206 (1981). Under 49 U.S.C. § 10905(c), once the I.C.C. has decided to permit an abandonment, it must publish its findings in the Federal Register for notice and comment.

The process for abandonment is set forth in 49 U.S.C. §§ 10903, 10904. However, under 49 U.S.C. § 10505, the I.C.C. has authority to grant exemptions from this process to certain carriers. *Illinois Commerce Comm'n v. United States,* 779 F.2d 1270, 1271–72 (7th Cir.1985). In the 1970's several major railroads went bankrupt and collapsed. Congress, to encourage revived private investment in rail transportation, drastically overhauled the Interstate Commerce Act to loosen "the vise grip of regulation through several important enactments, including the Staggers Act." *CMC Real Estate Corp. v. I.C.C.,* 807 F.2d 1025, 1031 (D.C.Cir.1986). The Staggers Act hastened the pace of rail deregulation by the exemptions provisions of 49 U.S.C. § 10505. "The express purpose of Congress in enacting section 10505 was to grant the Commission authority to review its regulations and withdraw any regulations found to be unnecessary to effectuate the goals of national transportation policy or regulations that served little or no public purpose." *Id.* The I.C.C. was charged with the responsibility for " 'actively pursuing exemptions for transportation and service that comply with the section's standards.' " *Id.* (quoting H.R.Rep. No. 1035, 96th Cong., 2d Sess. 60, *reprinted in* 1980 U.S.Code Cong. & Admin.News, 3978, 4005). As an example, Congress specifically removed the exemption hearing requirement to broaden the I.C.C.'s exemption authority. *CMC Real Estate Corp.* at 1032. The criteria for exemption for abandonment is in 49 C.F.R. § 1152.50. Under that section the railroad must file a *verified* notice with the Commission at least 50 days before the abandonment or discontinuance is to start. 49 C.F.R. § 1152.50(d)(2). The

notice "shall include the proposed consummation date", state that any traffic using the lines can be rerouted, and contain information about the railroad requested in 49 C.F.R. § 1152.22(a)(1)–(4) and (8). The notice will be published in the Federal Register within 20 days from the filing of the notice of exemption and the exemption *will be effective* 30 days after publication (unless stayed pending reconsideration). 49 C.F.R. § 1152.50(d)(3). Thus, the exemption takes the railroad out of the regulation scheme.

In *Idaho II,* the terms of the I.C.C. exemption stated that the railroads were required to notify the I.C.C. in writing within one year if "actual" abandonment was to take place. *Idaho II,* 617 F.Supp. at 214. The railroad in that case gave notice in writing that they had chosen not to proceed with actual abandonment but converted the line to side track for storage. *Id.* Thus, under the terms of exemption in that case, it is clear it was not a decree of abandonment.

Here Southern Pacific filed a notice of exemption on August 18, 1982 concerning its relocation project with Western Pacific. In the notice, the railroad petitioned the I.C.C., pursuant to 49 U.S.C. § 10505, for exemption from 49 U.S.C. §§ 10903–10907 to allow it to abandon the lines in Niles Canyon and Altamont Pass. *Vieux,* 695 F.Supp. at 1028. Although its August 18th notice is verified, there is no consummation date. Instead, the railroad's notice states that Southern Pacific "would not exercise its abandonment exemption authority, if granted, until and unless the SPT–WP (Southern Pacific and Western Pacific) trackage rights agreement had been approved by the Commission." This was purportedly to avoid any cessation of service to any shipper. The I.C.C. September 13, 1982 "Notice of Exemption" also contains no "consummation date." The I.C.C. Notice of Exemption does state that Southern Pacific "will abandon its line ... [c]oncurrently with acquiring trackage rights over the Western Pacific track." The agreement between Southern Pacific and Western Pacific, dated October 12, 1981, pro-

vides that "[t]his agreement ... shall become effective as of the date Southern commences to use said joint trackage, but no later than two (2) years from the date hereof, unless otherwise agreed to in writing by the parties hereto...."

The district court did not decide if the exemption in this case was such a decree. *Vieux*, 695 F.Supp. at 1029. Instead, the court stated

> Even assuming, *arguendo*, that the ICC's approval of Southern Pacific's "Notice of Exemption" did amount to the requisite congressional act ... the other prong of the *Idaho II* interpretation of the requirements for abandonment under § 912, i.e., the cessation of use and occupancy, has not been met.

*Id.* The exemption in this case was not the requisite decree or "Act of Congress" as called for by the statute. First, Southern Pacific received an "exemption" from the regulations—not a certificate of abandonment. This puts any decision by the railroad to abandon its lines outside the regulatory scheme of the I.C.C.; the I.C.C. regulates and approves abandonment. *Chicago & N.W. Transp. Co.*, 450 U.S. at 320, 101 S.Ct. at 1131; *CMC Real Estate Corp.* at 1031. The I.C.C. does not determine abandonment. Second, the "consummation date" of the abandonment was to be when Southern Pacific moved its services to the Western Pacific tracks. Part of the reason the I.C.C. approved the trackage rights agreement and the exemption from abandonment was because there would be no cessation of service for the shippers. This "consummation date" was in 1985, when Southern Pacific tore up its tracks and moved its operations to the Western Pacific lines. Third, the I.C.C. approval of abandonment, even in formal abandonment proceedings, is only a determination that under its Congressional mandate, cessation of service would not hinder I.C.C.'s purposes. It is not a determination that the railroad has abandoned its lines. Lastly, the only remedy for an "illegal" abandonment, that is one that is not approved by the I.C.C., is an injunction brought by the I.C.C., the U.S. or a state government. *Chicago & N.W. Transp. Co.* 450 U.S. at 322, n. 9, 101 S.Ct. at 1132–33, n. 9; *I.C.C. v. Chicago & N.W. Transp. Co.*, 533 F.2d 1025, 1028–29 (8th Cir.1976). Thus, a railroad could abandon without any involvement from the I.C.C., if there is no injunctive action brought and if a court decrees that the railroad has abandoned the line. The I.C.C. regulations and process determine what effects an abandonment will have and what the railroad must do to counteract those effects before it abandons, but they do not determine that an abandonment has actually occurred.

### b. Act of Congress

There is some evidence that the requisite Act of Congress is just that, a bill passed by Congress declaring a railroad right of way to be abandoned. The appellants contend that only the I.C.C. has the power to declare abandonments and that Congress delegated this exclusive power. However, the County, through Congressman Pete Stark, sponsored Pub.L. No. 100–693, 102 Stat. 4559 (1988), which as its purpose declares the rights of way in question in this litigation to be abandoned. "[Pub.L. No. 100–693] is intended to provide a Congressional pronouncement of abandonment of the type described in the 1922 Act." H.R. Rep. No. 941, 100th Cong., 2d Sess. (1988).

Although Pub.L. No. 100–693 gives us some clue as to the intent of Congress in interpreting § 912's language "Act of Congress," it does not and cannot affect this litigation. Pub.L. No. 100–693:

> Nothing in this Act shall be construed as expanding or diminishing any right, title, or interest of any party other than the United States in the real property described in section 3 which under applicable law vested in any such party on or before the date of enactment of this Act.

Pub.L. No. 100–693, 102 Stat. at 4559–60. Since this litigation involves only rights that vested, if at all, prior to enactment of Pub.L. No. 100–693, the new law cannot affect this litigation.

Further, there was testimony before the committee and discussion on the floor of the House which indicated an intent not to disturb this litigation.

[T]he committee amendments are intended to assure that the bill cannot be construed as an attempt to resolve any of the issues in ongoing litigation concerning these lands.... HR 4039 as reported includes explicit language that nothing in the bill is to be construed as expanding or diminishing any right these parties may have in the lands in question if that right vested on or before the date of enactment. I believe that this fully protects the position of all parties in the litigation.

— Cong.Rec. No. 7851 (September 20, 1988), (Statement of Congressman Vento (Minn.)). As the law itself purports not to intrude on this litigation, we cannot construe it to do so. Therefore, although this law indicates that the requisite "Act of Congress" is indeed an Act of Congress and not a declaration from the I.C.C., it is not an Act of Congress that affects the rights of these parties before us at this time.

### 2. Use and Occupancy.

■ Even though we have determined that the second prong of *Idaho II* has not been satisfied as there was no decree by a court or Congressional act, thereby precluding the finding of vested reversionary rights under § 912, appellants could have non-vested reversionary rights under the first prong of *Idaho II* triggered by abandonment of use and occupancy of the right of way by the railroad.

This inquiry is a factual one, looking for actual abandonment. The district court here interpreted "use and occupancy" of "railroad purposes" by first looking to the "plain and apparent meaning of the terms" of the statute and then turning to the common law principles of abandonment for guidance. *Vieux,* 695 F.Supp. at 1027–29; *see also Idaho II,* 617 F.Supp. at 217. Other circuits have characterized "abandonment" to be "an intention of the carrier to cease permanently or indefinitely all transportation service on the relevant line." *Chicago & N.W. Transp. Co.,* 450 U.S. at 314, n. 2, 101 S.Ct. at 1128, n. 2; *I.C.C. v. Chicago & N.W. Transp. Co.,* 533 F.2d at 1028 (citing *I.C.C. v. Maine Central R.R.,* 505 F.2d 590, 593 (2d Cir.1974)).

The district court here found that the "use and occupancy" of the right of way did not cease until April, 1985 at the earliest and perhaps even as late as August, 1985. *Vieux,* at 1032. The factual findings of the trial court will not be disturbed unless clearly erroneous. The district court, based on exhibits and declarations submitted at the court's request, found:

1. That Southern Pacific paid taxes on the rights of way through March 31, 1985 as "operating property" and through March 31, 1986 paid property taxes on its interest in the transferred rights of way as "nonoperating property." *Vieux* at 1030–31.

2. That Southern Pacific continued to use the rights of way through Niles Canyon and Altamont as a secondary route into the Bay Area from the Central Valley and for local customers through March, 1983. *Id.* at 1031.

3. After the winter storms in 1983, during which track in the Niles Canyon was damaged, necessary repairs were made to return the track to regular service and the track continued to be inspected by Southern Pacific throughout its entire length. *Id.* at 1032.

4. Southern Pacific did not rip out the tracks remaining after the 1983 winter storm on the Altamont Pass right of way until May, 1986. *Id.*

5. After March, 1983, Southern Pacific used the section of track east of the damaged portion for the storage of box cars. *Id.* at 1031.

6. Between March and August, 1985, Southern Pacific held training exercises involving the operation of engines and cars over the tracks in the Altamont Pass area east of Ulmar and west of Tracy. *Id.*

7. Plaintiff, R. Vieux (while in conflict with his declaration of March 17, 1987) testified in deposition that trains last passed across the right of way on his property between January and June, 1985 and that Southern Pacific's tracks and ties

across his land were not removed until August, 1986. *Id.* at 1032.

8. Plaintiff J. Jess (also in conflict with his declaration of March 17, 1987) testified in his deposition that Southern Pacific placed cattle guards at the two points where fencing crossed the tracks to allow the trains through without letting the cattle out in the summer of 1984 or 1985. He testified further that trains crossed his property last either in the summer of 1984 or 1985 and that Southern Pacific's tracks and ties remained until the summer of 1986. *Id.*

Thus it appears, and the district court found, that Southern Pacific's use and occupancy did not cease on its two respective rights of way until April, 1985 at the earliest and perhaps as late as August, 1985, when the railroad ceased to use the tracks for training exercises. *Id.* at 1032. *See also Matter of Chicago Milwaukee, St. Paul, and Pac. R.R. Co.*, 654 F.2d 1218, 1221 (7th Cir.1981) ("If trains continued to run on the line—albeit infrequently— ... then the railroad remained in possession.")

The court also looked to common-law principles of abandonment, that is, whether there is (1) present intent to abandon, and (2) physical acts evidencing clear intent to relinquish the property interest. *Vieux* at 1030 and n. 5; *Idaho II*, 617 F.Supp. at 217. The railroad showed through its notice of exemption and through its agreement with Western Pacific that it did not intend to abandon the track until the transfer to Western Pacific lines was complete, including the I.C.C. approval of the transfer. The "physical acts" of the railroad also show an intent not to abandon until at the earliest April of 1985. Not only the "use and occupancy" facts cited above illustrate this intent, but also the fact that the railroad quitclaimed the rights of way to the County, made an agreement with the County and took the fiber optics and pipeline easements back from the County all show an intent not to abandon. Conveyance of property and abandonment of property are not consistent actions. If the railroad had wanted to abandon the property, it would have simply followed the procedures outlined by the I.C.C. and allowed the reversion to take place, and would not have conveyed the land before their "use and occupancy" ceased. The district court's findings of fact are not clearly erroneous and are supported by the record as is its holding that abandonment occurred no earlier than April, 1985.

Having established that abandonment of the use and occupancy of the right of way has occurred, we must determine whether the county has legally established a public highway which would extinguish the appellants' non-vested reversionary rights.

3. Exceptions Clause—Legally Established Highway.

■■■ The appellants' non-vested reversionary rights are extinguished if the rights of way are "embraced in a public highway legally established within one year after the date of said ... abandonment." 43 U.S.C. § 912. State law determines what is a "public highway legally established" for the purposes of federal land grant statutes, including § 912. *Standage Ventures, Inc. v. Arizona*, 499 F.2d 248, 250 (9th Cir.1974). Under California common law, where a county is granted and accepts a right of way to be used exclusively for a county road, the acceptance of the grant operates to establish the right of way as a county highway. Cal.Sts. & High.Code § 941 (West Supp. 1989); *Watson v. Greely*, 69 Cal.App. 643, 649, 232 P. 475, 478 (1924). The action of the grant and acceptance of the right of way constitutes a dedication of the strip to county road purposes. *Watson*, 69 Cal. App. at 649, 232 P. 475. No improvement is necessary to make the right of way a highway. *Venice v. Short Line Beach Land Co.*, 180 Cal. 447, 181 P. 658, 659 (1919). Southern Pacific "granted" these rights of way to the County in its agreement of April 23, 1985 when it agreed to quitclaim the rights of way if the County placed them "into the County's highway system to be used for highway and/or transportation related facilities purposes thereafter." Plaintiffs' Trial Ex. 56 at 1, ¶ 1. The County accepted these grants and embraced them as part of the county system of highways when on April 23, 1985, it

passed the County Board Resolution. Defendants' Trial Exs. H and I; *Vieux* at 1026.

Appellants contend that this is not enough and that appellees must also comply with the California Environmental Quality Act of 1970 (CEQA). Cal.Pub.Res. Code § 21000–21165. Appellants alleged that appellees did not comply with CEQA because they did not prepare an environmental impact report (EIR). CEQA has a three tier structure to determine the necessity of an EIR. *Perley v. County of Calaveras*, 137 Cal.App.3d 424, 430, 187 Cal. Rptr. 53, 56 (1982). If a project is exempt or if it is certain that the activity will have no significant effect on the environment then no further evaluation is required. Cal.Pub.Res.Code §§ 21084, 21085; 14 Cal. Admin.Code § 15060 (West 1986). If there is a possibility that the project may have a significant effect but after an initial threshold study by the State Resources Agency it is determined there will not be a significant effect, the agency may declare this in a brief Negative Declaration. 14 Cal.Admin. Code § 15083. Last, if the project will significantly affect the environment, an EIR is required. Cal.Pub.Res.Code §§ 21100, 21151; *Perley*, 137 Cal.App.3d at 430, 187 Cal.Rptr. at 56. The County Board of Supervisors on April 12, 1985, adopted a Negative Declaration as no significant impact upon the environment was contemplated with the granting and acceptance of the rights of way because they had no physical effect on the land.

> [W]hen the county is prepared to adopt more specific plans for construction projects on the donated land, it will have to comply with CEQA's requirements before proceeding with those projects.

*Vieux* at 1027 (quoting the County's Memorandum in Opposition to Plaintiff's Petition for Writ of Mandate). The district court found that "CEQA only stands as a bar to the County's *future use*, if any, of the legally established highway." *Vieux* at 1027 (emphasis in original). We agree with the district court and affirm its finding that the County legally established a public highway and complied with CEQA and we further hold that this occurred within one year of abandonment. This vests the own-ership of the rights of way with the County and extinguishes all of appellants' reversionary rights.

*B. Limited Evidence.*

Appellants objected to the court's decision to accept only exhibits and declarations on the issue of abandonment, especially those of the County and Southern Pacific, as hearsay. Appellants contended they should have had a right to cross examine the adverse witnesses. The district court overruled their objections as appellants were told during the trial on March 4, 1987, to file counterexhibits and declarations if they thought them to be appropriate. Appellants failed to do so. *Vieux* at 1030 n. 7. The district court also noted in its opinion that some of appellants' declarations submitted before trial contradicted appellants' own deposition testimony. *Id.* The district court's evidentiary rulings can be reversed only if it abused its discretion. *Maddox v. City of Los Angeles*, 792 F.2d 1408, 1412 (9th Cir.1986). A reviewing court cannot reverse for an abuse of discretion unless it has a definite and firm conviction that the court below committed an error. *Id.* Here, the district court gave the parties ample opportunity to submit their evidence. As some of the plaintiffs' evidence was self-contradictory, it would be difficult to say the court abused its discretion in allowing only exhibits and documentary evidence. *See Idaho II* at 214. This limitation is also reasonable in light of the fact that most of the relevant information would be proven through documents—for example, if Southern Pacific was paying taxes on the land; if their training exercises were directed there. Additionally, the "testimony" of plaintiffs as to when they saw trains crossing their line was contradictory and not as reliable as the written documents submitted. Therefore, the court did not abuse its discretion when it limited the evidence on the issue of abandonment.

*C. Other Actions Against the County and Southern Pacific*

Appellants' rights to the property stem only from the reversionary rights established in 43 U.S.C. § 912. We have found that these reversionary rights were extin-

guished in April, 1985, when Southern Pacific conveyed the rights of way to the County and when the County legally established a public highway. This disposes of all other issues in this case against these defendants. Appellants have no further interest in the land and the County's actions were legal. We affirm the district court's summary judgment in favor of the County and Southern Pacific on the other causes of action including the federal civil rights action, the quiet title actions and the actions under California law.

*D. Actions Against the Park District.*

 1. The § 1983 claims against the Park District.

 The appellants contend that the Park District conspired with Southern Pacific and Alameda County to unlawfully take the property rights of appellants and introduced legislation before Congress for the purpose of accomplishing this objective with the knowledge that the legislation would be unlawful. The appellants specifically allege that:

 The County, PARK DISTRICT and SP (Southern Pacific) implemented a fraudulent scheme so that their goals (a County land grab, a PARK DISTRICT trail and an SP illegal fiber optics line) could be implemented by defrauding the plaintiffs of their reversionary rights through bad faith semantic manipulation of federal law (43 USC 912).

In order to prove a civil conspiracy, the parties to have conspired must have reached "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1020 (9th Cir.1985) (citations omitted), *cert. denied*, 474 U.S. 1059, 106 S.Ct. 802, 88 L.Ed.2d 778 (1986). A civil conspiracy is a combination "of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Doleman v. Meiji Mut. Life Ins. Co.*, 727 F.2d 1480, 1482 n. 3 (9th Cir.1984) (citations omitted).

 Here, the district court found that appellants had not met their burden by failing to produce any evidence supporting the theory of conspiracy. We agree and affirm the district court. The Federal Rules of Civil Procedure, Rule 56(c) "mandates the entry of summary judgment ... against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552.

Although appellants showed correspondence or discussions between the Park District and other defendants, they have not shown an "illegal objective." The appellants allege that the Park District's objective in the conspiracy was an illegal taking of property. However, because the County legally acquired the property, there was no intent to cause an illegal taking. The Park District's introduction of legislation which might have given them an interest in the rights of way also was not illegal. The Park District had a right to assert a legitimate inquiry into the possibilities of acquiring the rights of way and without more evidence of an "illegal" objective, the lobbying is not evidence of the alleged conspiracy. Further, appellants' argument is based on the fact that the County's and Southern Pacific's actions were illegal, and thus the Park District's participation in discussions concerning the rights of way was illegal as well. Appellants based their contention on the I.C.C.'s approval of the railroad's exemption application. They claim the date of the Notice of Exemption is the date of abandonment, that the defendants knew this and they proceeded to deny the appellants their reversionary rights anyway. We have already held that abandonment did not occur when the exemption notice was issued. Therefore, the appellants had no reversionary interest at that time and the appellees here, especially the Park District, in no way "denied" the landowners their reversionary rights in any way other than that provided for in 43 U.S.C. § 912.

 2. The federal and state quiet title claims.

 The Park District does not now hold, nor has ever in the past held any valid

legal interest in the disputed property. The appellants contend that "the Park District is perched to accept the rights of way: an acceptance that would clearly violate 43 U.S.C. § 912." The district court found that because the Park District had no current interest in the disputed property that the claims were "purely hypothetical, and would require this court to issue an advisory opinion." The district court found it lacked jurisdiction to hear the action because it was not an actual case or controversy. We agree.

Federal Courts are limited to deciding the outcome of an actual "case or controversy." U.S. Const. Art. III; *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239, 57 S.Ct. 461, 463, 81 L.Ed. 617 (1937).

> It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts.

*Aetna Life Ins. Co.*, 300 U.S. at 241, 57 S.Ct. at 464. The ripeness doctrine prevents courts from deciding abstract issues that have not yet had a concrete impact on the parties. *Assiniboine and Sioux Tribes v. Bd. of Oil and Gas Conservation*, 792 F.2d 782, 787 (9th Cir.1986). The ripeness inquiry looks to (1) whether the issue is fit for judicial decision and (2) hardship to the parties if the review is withheld. *Id.* at 788. Appellants want either the disputed land in question, damages for the taking of the land and/or a declaration that they have rights to the land. The Park District here does not have any title to the land so cannot hand over the land to appellants, nor can they be liable for damages for a "taking." A declaration as to the rights to the land would be equally futile. 28 U.S.C. § 2201 (1982) (Declaratory Judgment Act applies only to "a case of actual controversy").

### III.

### CONCLUSION

Appellants lost their reversionary rights under 43 U.S.C. § 912 when the railroad actually abandoned their rights of way, conveyed them to the County for a public highway, and the County established a legal public highway under the exceptions clause of § 912. Thus, no additional causes of action lie against the County or Southern Pacific as appellants have no property interest to assert. Appellants' Writ of Mandate was properly denied as the County's actions were not illegal. Appellants have no legal controversy with the Park District. As appellants have not prevailed, no attorneys fees will be awarded.

The plaintiffs also claim reversionary rights to the disputed land under private land grants. In their complaint, plaintiffs allege rights to the land based on the federal statute and private grants. (Plaintiffs' Complaint, p. 18, § 42 & ex. A). The issue of plaintiffs' potential reversionary rights under private land grants was not separately considered by the district court. The district court held that plaintiffs had no reversionary rights under the federal statute and then dismissed the plaintiffs' remaining claims on the basis that they could not state any other claims because the federal statute extinguished any reversionary rights in the land they might have had. However, the district court's disposition fails to consider that some of the plaintiffs may have reversionary rights in the land by virtue of the private land grants. Because the district court did not rule on the issue, this opinion does not affect the claims of those landowners who may have reversionary rights under private land grants. We affirm the district court's opinion regarding the Act of Congress grants but reverse and remand for further proceedings regarding the private land grants in this case.

This panel retains jurisdiction for all further appeals in this matter.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.